# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**GARY LAWRENCE**

       Plaintiff,                               Case No. 4:26-cv-193

       v.                                      **CAPITAL CASE**

**RON DESANTIS**, Governor,
    in his official capacity;

**BLAISE INGOGLIA**, Chief Financial Officer,
    in his official capacity;

**JAMES UTHMEIER**, Attorney General,
    in his official capacity;

**WILTON SIMPSON**, Commissioner of Agriculture,
    in his official capacity;

**DAVID WYANT**,
    Chairperson, Florida Commission on Offender Review,
    in his official capacity;

**RICHARD D. DAVIDSON**,
    Commissioner, Florida Commission on Offender Review,
    in his official capacity;

**S. MICHELLE WHITWORTH**,
    Vice Chair, Florida Commission on Offender Review,
    in her official capacity;

**BRANDY FORTUNE**,
    Research Specialist, Florida Commission on Offender Review,
    in her official capacity;

**IAN BERRY**,
>  Coordinator, Office of Executive Clemency,
>  in his official capacity;

**STEPHEN HEBERT**,
>  Director, Office of Clemency Investigations,
>  in his official capacity.

>  Defendants.

_____/

## 42 U.S.C. § 1983 COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.    NATURE OF ACTION

1.    Gary Lawrence is a death-sentenced individual with intellectual disability, post-traumatic stress disorder, and severe memory deficits. On February 27, 2026, as part of Florida's clemency scheme—the last critical stage of capital proceedings prior to the signing of a death warrant—he submitted to transcribed questioning by the Florida Commission on Offender Review ("FCOR"). Due to Florida's restrictive clemency rules, the only individual permitted to appear on Mr. Lawrence's behalf was Jonathan Hackworth, an appointed clemency attorney with no prior familiarity with Mr. Lawrence or his case.

2.    Prior to the clemency interview, Mr. Lawrence's federal habeas counsel advised Defendants that his disabilities significantly impaired his ability to engage in impromptu verbal questioning. A psychological expert familiar with Mr.

2

Lawrence's disabilities provided a list of simple accommodations that would enable Mr. Lawrence to meaningfully participate in the clemency process, including allowing Mr. Lawrence to respond to FCOR's questions in writing after a reasonable amount of time to process the information. Yet, Defendants have obstructed Mr. Lawrence's ability to do this, because they have forbidden him from obtaining the prepared transcript of his own interview. Indeed, clemency attorney Hackworth has explicitly refused Mr. Lawrence's directive to provide him with the transcript prepared by FCOR's retained court reporter—because Defendants have instructed that such provision is strictly prohibited by state statute and the Rules of Executive Clemency.

3.      Defendants' overbroad application of Florida's statutory and rules-based clemency secrecy provisions to deny Mr. Lawrence access to his transcript violates his right to due process at that critical stage. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring in part and in the judgment) (death-sentenced individuals retain a protected interest in their lives at the clemency stage, and as such due process requires that at least "some minimal procedural safeguards apply to clemency proceedings"). The deprivation of something as basic to fundamental fairness as a transcript—particularly where, as a result of Mr. Lawrence's significant disabilities, receiving that document is the only

3

way for him to meaningfully participate in the clemency process—is constitutionally intolerable and warrants this Court's intervention.

## II.    PARTIES TO THE COMPLAINT

### A.    Plaintiff

4.    Mr. Lawrence is a death-sentenced prisoner at Union Correctional Institution in Raiford, Florida, under the custody of the Florida Department of Corrections. Mr. Lawrence is a resident of the State of Florida. The deadline for Mr. Lawrence's counseled clemency submission—the last formal process as of right under Florida's capital scheme prior to issuance of a death warrant—was due on Sunday, March 29, 2026. Thus, although there has been no final clemency decision rendered in his case, he is considered warrant-eligible under Florida law.

### B.    Defendants

5.    Defendant Ron DeSantis is the Governor of Florida and the head of the Clemency Board. He is sued in his official capacity.

6.    Defendant Blaise Ingoglia is the Chief Financial Officer of Florida and thus by statute a member of the Clemency Board. He is sued in his official capacity.

7.    Defendant James Uthmeier is the Attorney General of Florida and thus a member of the Clemency Board. He is sued in his official capacity.

8.    Defendant Wilton Simpson is the Commissioner of Agriculture of Florida and thus a member of the Clemency Board. He is sued in his official capacity.

9.    Defendant David Wyant is the Chairman of the Florida Commission on Offender Review, the agency that facilitates the clemency process on behalf of the Clemency Board. He is sued in his official capacity.

10.    Defendant Richard D. Davidson is a Commissioner of the Florida Commission on Offender Review, the agency that facilitates the clemency process on behalf of the Clemency Board. He is sued in his official capacity.

11.    Defendant S. Michelle Whitworth is the Vice Chair of the Florida Commission on Offender Review, the agency that facilitates the clemency process on behalf of the Clemency Board. She is sued in her official capacity.

12.    Defendant Brandy Fortune is the Research Specialist of the Florida Commission on Offender Review, an agency that facilitates the clemency process on behalf of the Clemency Board. She is sued in her official capacity.

13.    Defendant Ian Berry is the Coordinator of the Office of Executive Clemency. He is sued in his official capacity.

14.    Defendant Stephen Hebert is the Director of the Office of Clemency Investigations within the Florida Commission on Offender Review. He is sued in his official capacity.

### III.    JURISDICTION AND VENUE

**A.    Jurisdiction**

15.    This action arises under federal statute and presents a federal question within this Court's jurisdiction under Article III and 28 U.S.C. §§ 1331 and 1343(a)(3). This action is brought pursuant to 42 U.S.C. § 1983. This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, and Federal Rule of Civil Procedure 65.

**B.    Venue**

16.    The Northern District of Florida is an appropriate venue for this action. The majority of Defendants live and work in this District, and the actions and decisions giving rise to this suit occurred in this District.

### IV.    STATEMENT OF FACTS

17.    This complaint concerns the clemency proceedings of Gary Lawrence, a death-sentenced individual in the State of Florida. Clemency has long been regarded as the ultimate act of grace or mercy, and in the capital context, it is the difference between life and death. Due to Florida's extensive secrecy surrounding executive clemency proceedings, Mr. Lawrence is unable to provide numerous background facts, including when clemency proceedings were first initiated, what communications have occurred between his clemency counsel and Defendants, what actions his clemency counsel purported to take in relation to clemency proceedings,

6

or what Defendants have learned about Mr. Lawrence or his case from their research and outreach during the clemency process. Mr. Lawrence submits that if additional facts necessary to grant relief on his complaint, they are Defendants' duty to disclose through discovery or an evidentiary hearing.

**A.    Defendants were made aware of the fact that Mr. Lawrence's disabilities and traumatic exposures would impede his ability to communicate during the structured clemency interview.**

18.    On Tuesday, February 24, 2026, federal habeas counsel for Mr. Lawrence sent the following communication to Defendants Fortune and Whitworth:

> Please find attached a set of recommendations from Dr. Adeyinka Akinsulure-Smith, Ph.D., ABPP, which will assist Mr. Lawrence in meaningfully participating in his clemency interview this Friday, February 27. As you may already be aware, Mr. Lawrence suffers from an intellectual disability and a profoundly traumatic background, both of which have bearing on his ability to verbally communicate. The accommodations suggested by Dr. Akinsulure-Smith are critical to enabling Mr. Lawrence to meaningfully respond to the Clemency Commission's inquiries.

App. A (2/24/26 Email from Katherine A. Blair to Defendants Fortune and Whitworth).

19.    In the attached document, Dr. Akinsulure-Smith explained that Mr. Lawrence was uniquely impaired in verbally communicating about his traumatic life history:

> Although at times it has been challenging to develop rapport with some of the trauma survivors I have worked with in the past, by drawing on my extensive clinical skills, I have always eventually had success. As I told you, it was very hard for Mr. Lawrence to discuss his history with

7

me. In fact, he became so emotionally distressed that he shut down and was unable to do so.

*    *    *    *    *

Mr. Lawrence will most likely have difficulty articulating his experiences (as we have already noted) during any type of sustained questioning. In fact, it is highly likely that Mr. Lawrence's memories of those traumatic experiences may be too overwhelming to verbalize, especially if (as I suspect), they were accompanied by extreme humiliation....Finally, please recognize that all of these trauma responses that impede effective communication will be further exacerbated by his intellectual disability diagnosis.

App. B (2/23/26 Letter from Dr. Adeyinka Akinsulure-Smith).

20.    Dr. Akinsulure-Smith provided a list of simple adjustments that would enable Mr. Lawrence to more fully participate in his clemency process:

1. Where possible, present Mr. Lawrence all materials and questions to be asked of him before his hearing so that he can review and process his responses ahead of time as he may become overwhelmed with a myriad of emotions that could impact his memory and verbal capacities (all further compromised by his intellectual disability).

2. Write all information using simple, clear language with short and complete sentences.

3. During his Clemency Hearing, ask all questions slowly, simply, and clearly (again, utilizing short and complete sentences).

4. If he appears "frozen," "shut down," or confused; please repeat, reword and/or rephrase questions.

5. Allow time for his responses.

6. Include the opportunity for him to submit additional written responses upon reflection after the Clemency Interview.

7. Permit rest/break periods as needed during the process.

Sincerely,

8

App. B.

21.    On Wednesday, February 25, 2026, Defendant Fortune responded only: "Your correspondence has been received." App. C (2/25/26 Email from Defendant Fortune to Katherine A. Blair). Defendants did not further acknowledge Dr. Akinsulure-Smith's findings or recommendations.

**B.    Purporting to rely on state statutes and rules, Defendants arbitrarily deprived Mr. Lawrence of a readily-available transcript of his clemency interview.**

22.    On February 27, 2026—the date of his clemency interview and his first and only meeting with attorney Hackworth—Mr. Lawrence provided a written, notarized directive that Hackworth "provide me with a copy of my 2/27/26 clemency interview transcript." App. D (2/20/26 Directive of Plaintiff Gary Lawrence); *see also* App. E (3/25/26 Declaration of Plaintiff Gary Lawrence). Mr. Lawrence, having been made aware that written submissions were due a month after the interview date, directed Hackworth to request the transcript immediately following his interview and to mail the copy immediately on receipt. App. D; App. E. He asked Hackworth to notify him by email or other written communication when he had requested the transcript, and additionally when the transcript was received and mailed. App. D; App. E.

23.    In response, Hackworth verbally informed Mr. Lawrence "that he was not allowed to provide [him] with a copy of the transcript. He then told the [FCOR]

9

commissioners overseeing [Mr. Lawrence's] interview that [he] had asked for the transcript, and he was not allowed to give it to [Mr. Lawrence]." App. E.

24. Attorney Hackworth's refusal to provide Mr. Lawrence with the clemency transcript appears to be the result of Defendants' guidance. In a January 8, 2026, email exchange related to a different case, FCOR Capital Punishment Research Specialist Brandy Fortune had instructed Hackworth:

> [Y]ou are correct you cannot provide a copy of a clemency interview transcript to an inmate nor any inmate representative. Other than clemency counsel himself or herself, Rule 15.G., does not authorize the production or disclosure of a copy of the clemency interview transcript to an inmate or his or her representative.

App. F (1/18/26 Email from Defendant Fortune to Jonathan Hackworth).

25. As the purported basis for this position, Defendant Fortune stated:

> Rules 15 and Rule 16 dictate that "all records and documents generated and gathered in the clemency process are confidential and shall not be made available for inspection to any person except members of the clemency board and their staff." Additionally, both Rules 15 and 16 prohibit disclosure of any record or document gathered in the clemency process absent the express permission of the Governor. No other member of the Clemency Board or "any other state entity" may disclose the same without, again, the express permission of the Governor. Even if such Governor access or authorization is granted, such authorization or grant or approval "does not constitute a waiver of confidentiality."

> Additionally, s. 14.28, Fla. Stat., sets out the confidentiality of clemency records—"All records developed or received by any state entity pursuant to a Board of Executive Clemency investigation shall be confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution" and that it is the Governor who controls any such release or disclosure.

App. F.

**C.    Mr. Lawrence can have no notice or meaningful opportunity to be heard during the clemency process without provision of his interview transcript and time to respond.**

26.    As explained above, Mr. Lawrence's disabilities rendered him unable to meaningfully answer the questions posed by FCOR during his clemency interview. He is unable to even recall the interview questions—which are the only notice he will ever receive regarding what is relevant to his clemency determination. *See* App. E. Thus, without a transcript of the interview, Mr. Lawrence can have no notice or meaningful opportunity to be heard at a critical stage of the capital process.

27.    Specifically, Mr. Lawrence explained:

> 5. I remember very little of was said or asked of me at my clemency interview, so I especially need a copy of the transcript. I know that I was asked questions that I had trouble answering, particularly about my time at the Dozier School for Boys in Marianna, and would like a chance to respond to those questions in a written statement which I was told is due to the commissioners no more than thirty (30) days after my interview.

> I hereby certify that the facts set forth are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. §1746.
>
> Gary Lawrence   3-25-26
> Gary Lawrence

App. E.

28.    At Defendants' instruction to clemency attorney Hackworth, Mr. Lawrence is prohibited from accessing the transcript of the interview. And he is obstructed from accessing a copy of what Hackworth—an attorney wholly

11

unfamiliar with Mr. Lawrence's life history and case, yet the only person purporting to act on his behalf who has access to the transcript—submitted on his behalf. *See* App. G (9/22/25 Email from Defendant Fortune to Katherine A. Blair) (stating that even the *existence* of a clemency application cannot be disclosed to federal counsel for Mr. Lawrence without express permission of the Governor).

**D.    Defendants' deprivation causes particularized harm to Mr. Lawrence because it renders him unable to communicate aspects of his life history that are highly relevant to a capital clemency determination.**

**i.    Florida has explicitly recognized Mr. Lawrence as a victim of its own abuse and rehabilitative negligence, and acknowledged that he is entitled to tangible and equitable reparations for the lifelong harm the State's malfeasance caused him.**

29.    At 68 years old, Gary Lawrence has lived nearly 70% of his life behind bars—all of which began when he was sent to Marianna's Arthur G. Dozier School for Boys ("Dozier") in May of 1973 after a nonviolent breaking and entering charge. Dozier—a glorified labor camp now shuttered for nearly 15 years—was internationally recognized for its systemic failures and inhumane treatment of juvenile boys. At the facility, 'rehabilitation' was reduced to fear-enforced compliance and maintained through physical and emotional abuse, including whippings, beatings, prolonged isolation, and humiliation.

30.    A slight, "very slow" fifteen-year-old boy with long blond hair and delicate features, Mr. Lawrence was immediately singled out for sexual harassment by a high-ranking Dozier staff member, Troy Tidwell. Less than a week later,

another teenaged boy who had witnessed the escalating threats directed at Mr. Lawrence warned him that he was about to be raped by the staff. The boy offered to help him escape and they fled, but were hunted down in Marianna and returned to Dozier.

31.   As punishment, Mr. Lawrence was thrown into solitary confinement for a month. The cell was filthy, bare, and cut off from all contact. He was starved, left without running water, and provided only a bucket to use as a toilet.

32.   When Mr. Lawrence finally emerged, physically and psychologically weakened, the abuses he had originally attempted to flee were inflicted. He was taken to a building referred to as 'the White House,' where the worst physical, sexual, and emotional abuse at Dozier took place because the building's loud exhaust system best muffled the sound of screaming. Mr. Lawrence was tied to furniture in the Whtie House for days, where he was starved, forced to urinate on himself, and repeatedly brutalized, including by older boys recruited by the staff. He could not sleep. Battered, violated, soiled, and at the mercy of the staff's violent whims, Mr. Lawrence thought he might die. This continuous cycle of attacks did not stop until his release.

33.   While perhaps not as viscerally shocking as its legacy of abuses, Dozier's absence of meaningful educational and social services was one of its most significant failings and just as detrimental to Mr. Lawrence's life upon release. The

13

prioritization of punishment and profit over counseling and rehabilitation meant that those confined were forced to navigate peer violence, abuse from authorities, and the uncertainties of daily survival in a dangerous place without any advocacy or guidance. This rehabilitative negligence worsened rather than bettered life outcomes for many children who passed through its doors, including subsequent arrests and prison sentences. As for Mr. Lawrence, less than a month after his release from Dozier's torture chambers, he was again arrested on a nonviolent breaking and entering charge, and ultimately sent to a violent adult prison as a 16-year-old child.

34.    The Florida Legislature has now recognized specific boys with increased carceral contact after Dozier as victims of rehabilitative negligence who are entitled to tangible and equitable reparations. The Attorney General's Office— the same entity tasked with pursuing Mr. Lawrence's execution—explicitly recognized Mr. Lawrence as one of these eligible victims, based on his subjection to abuse and rehabilitative negligence. This was an acknowledgement by state officials that not only did their predecessors fail Mr. Lawrence, but that the resulting traumatic effects endured throughout his life.

ii.    **Mr. Lawrence's comorbid vulnerabilities made him more susceptible to the lifelong traumatic effects of Dozier.**

35.    The harm Mr. Lawrence experienced at Dozier was compounded by the impacts of his preexisting adverse childhood experiences, intellectual disability, and

14

early exposure to drugs and alcohol—all of which significantly impeded him from developing healthy coping mechanisms.

36.   Mr. Lawrence was the youngest of seven children born into a family wrought with alcoholism, domestic violence, extreme poverty, and parental neglect. Because Mr. Lawrence's parents spent the vast majority of their income sustaining their substance addictions, the family lived in a home with no indoor plumbing, no telephone, a ceiling that was neither sealed or insulated, windows with no barrier aside from wooden shutters, and one fireplace to heat the entire home. The children all slept in one room, which also served as the living room, dining room, and kitchen.

37.   The abuse of drugs and alcohol in Mr. Lawrence's immediate community was rampant. From the time he was a small child, his parents put alcohol in soda containers for him to drink. He cannot remember a time before he was consuming alcohol. On tenth birthday, older boys who acted as role models gave him marijuana and LSD. With cognitive disabilities, symptoms of post-traumatic stress disorder, and a lack of adequate nurturing and supervision, Mr. Lawrence's substance use increased drastically from that point on, culminating in a public intoxication charge the day after his fifteenth birthday.

38.   By the time he was 12 years old, Mr. Lawrence was living alone in the home with his father, Samuel Lee—all of his siblings and mother had fled the life-threatening assaults Samuel Lee inflicted with his hands and weapons. Despite his

15

older siblings' entreaties to leave, Mr. Lawrence stayed because Samuel Lee was constantly intoxicated to the point of being unable to meet his own essential needs. He would have died without his young son's caretaking. From that point, as a result of Mr. Lawrence's show of love and duty, he received the entirety of his father's abuse.

39.    Although Mr. Lawrence viewed school as a respite from his tortured home life, he struggled with schoolwork and—as with other critical areas of his life—never received proper interventions. His first-grade teacher recommended that he repeat the grade, but was socially promoted due to parental demand. Even after repeating the second grade, he could not catch up academically because he was unable to master basic foundational knowledge. By the fourth grade, his teacher recognized that even repeated grade retention would not effectively address the underlying issues or put him on track for academic success. She insisted that his early childhood IQ score of 72 was inaccurately high, and that testing be redone to determine whether Mr. Lawrence qualified for Special Education classes. The retesting never occurred, and Mr. Lawrence continued to be socially promoted despite low and failing grades. After being retained twice in the seventh grade, he eventually dropped out before the third time. At this point, he was still unable to read. Despite numerous lifelong red flags, it was only after decades on death row

16

that Mr. Lawrence finally received the intellectual disability diagnosis that should have been rendered when he was six years old.

40. Although Mr. Lawrence's intellectual disability and upbringing made him vulnerable to the corrosive effects of his many early traumas, he thrives when placed in a safe and structured environment. In the 30 years that Mr. Lawrence has been incarcerated on Florida's death row, he has not received a single disciplinary report. He lives peacefully and abides by institutional rules.

41. Much of the abovementioned information has been contextualized by Dr. Akinsulure-Smith, and supports the position that Mr. Lawrence is an ideal candidate for clemency. App. H (3/23/26 Report of Dr. Adeyinka Akinsulure-Smith).

## V.   CAUSE OF ACTION

42. As described in more detail in Mr. Lawrence's accompanying memorandum in support of this complaint, Defendants violated his federal constitutional due process rights by depriving him of access to a transcript of his clemency interview, which in conjunction with Florida's other restrictive clemency rules and in light of Mr. Lawrence's disabilities, prohibited him from meaningfully participating in this critical stage of his capital proceedings.

43. The United States Supreme Court has recognized that the importance of the clemency process in a capital case cannot be understated: "[F]ar from

regarding clemency as a matter of mercy alone, we have called it 'the "fail safe" in our criminal justice system.'" *Harbison v. Bell*, 556 U.S. 180, 192 (2009) (quoting *Herrera v. Collins*, 506 U.S. 390, 415 (1993)). And, the Supreme Court has also recognized that a level of due process applies to clemency proceedings. *See Woodard*, 523 U.S. 272, 288-29 (O'Connor, J., concurring in part and in the result). When the clemency process is rendered meaningless, as it was here, Florida's death penalty scheme is constitutionally defective.

44.    Mr. Lawrence's clemency process did not comport with due process. To support withholding Mr. Lawrence's transcript, and in contrast to their implied permissions in other cases, Defendants have suddenly perpetuated an arbitrarily restrictive reading of Florida's clemency statute and rules.

45.    The intentional withholding of a transcript of Mr. Lawrence's own interview—particularly in the context of Florida's other clemency restrictions, which ensure he receives no adequate substitute—violates the most basic concept of due process: notice and an opportunity to be meaningfully heard. A transcript is "the most basic and fundamental tool" for Mr. Lawrence to advocate for his life at this final stage of his capital process. *See Hardy v. United States*, 375 U.S. 277, 288 (1964) (Goldberg, J., concurring) (discussing the role of a transcript in the criminal appellate process). Indeed, Defendants tacitly acknowledge this by invariably enlisting the services of a court reporter to transcribe every clemency interview, and

18

stating that "[u]pon request, a copy of the actual transcript of any statements or testimony of the inmate relating to a clemency investigation shall be provided to the state attorney, the inmate's clemency counsel, or victim's family"—all of whom are invited to "file a written statement, brief, or memorandum on the case[.]" Rule 15(G), Rules of Executive Clemency.

46.    Previously, Defendants and their predecessors have provided transcripts to clemency counsel and endorsed no such restriction on that counsel's ability to provide it to their own client or counsel in the underlying capital case. At least twice in the past several years, Defendants and their predecessors have been parties to clemency-related 42 U.S.C. § 1983 actions wherein the plaintiffs included as exhibits the interview transcripts received from clemency counsel. *See, e.g.*, *Bowles v. DeSantis et al.*, Case No. 4:19-cv-319-MW-CAS, Doc. 1-1 at 47-105 (N.D. Fla. July 11, 2019); *Barwick v. DeSantis et al.*, 4:23-cv-146-RH, Doc. 2-1 at 4-61 (N.D. Fla. Apr. 13, 2021). During neither of these actions did Defendants suggest the client's receipt of the transcript was improper, nor clemency counsel's provision of the transcript to the client's federal counsel. Indeed, the State of Florida itself publicly attached a clemency interview transcript in support in defending against similar § 1983 claims related to the capital clemency process. *See Valle v. Scott et al.*, Case No. 3:11-cv-953-MMH, Doc. 9-3 at 94-102 (M.D. Fla. Sep. 24, 2011). This uneven application of the purported statutory and rule-based

19

requirement demonstrates the unconstitutional arbitrariness of Defendants' action. Put simply, Defendants only interpret those provisions to require withholding the clemency transcript when such an interpretation benefits Defendants and harms the death-sentenced individual. Any other explanation for forbidding a death-sentenced individual from accessing a transcript of his own interview is nonsensical.

47.     Disallowing Mr. Lawrence—who by virtue of his intellectual disability, symptoms of traumatic stress disorder, and severe memory deficits has no way to adequately respond to the questions posed to him without a written record of what was asked—from the same transcript access provided to those trying to kill him is so arbitrary and obstructive to his meaningful participation that it renders the clemency process akin to a coin flip.

48.     As noted, this cause of action is described in more detail in Mr. Lawrence's accompanying memorandum. For the reasons elaborated there, this Court should grant declaratory and injunctive relief.

## VI.   REQUEST FOR RELIEF

WHEREFORE, Mr. Lawrence respectfully requests that this Court:

a) Enter a declaratory judgment under 42 U.S.C. § 1983 finding that Defendants violated Mr. Lawrence's federal constitutional due process rights during executive clemency review;

b) Enter injunctive relief to prevent Defendants from issuing an executive clemency determination without first providing Mr. Lawrence with a transcript of his clemency interview and affording him adequate time to prepare a written submission in support of a life sentence;

c) Order discovery and an evidentiary hearing; and

d) Grant any other relief this Court finds just and proper.

## VII.   CERTIFICATION

Katherine A. Blair, attorney for Mr. Lawrence in the above-entitled action, certifies that, to the best of her knowledge and belief, the facts set forth in this complaint are true and correct.

Respectfully submitted,

/s/ Katherine A. Blair
KATHERINE A. BLAIR
   Assistant Chief, Capital Habeas Unit
HEATHER GLOBERMAN
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301
(850) 942-8818
Katherine_Blair@fd.org

*Counsel for Mr. Lawrence*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading has been furnished by electronic mail to counsel for the Defendants, the Office of the Attorney General. Service will be completed upon issuance of the summons.

/s/ Katherine A. Blair
KATHERINE A. BLAIR

22