**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**GARY LAWRENCE**

Plaintiff, Case No. 4:26-cv-193

v. **CAPITAL CASE**

**RON DESANTIS**, Governor,
in his official capacity;

**BLAISE INGOGLIA**, Chief Financial Officer,
in his official capacity;

**JAMES UTHMEIER**, Attorney General,
in his official capacity;

**WILTON SIMPSON**, Commissioner of Agriculture,
in his official capacity;

**DAVID WYANT**,
Chairperson, Florida Commission on Offender Review,
in his official capacity;

**RICHARD D. DAVIDSON**,
Commissioner, Florida Commission on Offender Review,
in his official capacity;

**S. MICHELLE WHITWORTH**,
Vice Chair, Florida Commission on Offender Review,
in her official capacity;

**BRANDY FORTUNE**,
Research Specialist, Florida Commission on Offender Review,
in her official capacity;

**IAN BERRY**,
Coordinator, Office of Executive Clemency,
in his official capacity;

**STEPHEN HEBERT**,
Director, Office of Clemency Investigations,
in his official capacity.

Defendants.
_______________________________/

**APPENDIX TO 42 U.S.C. § 1983 COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

| TAB | DESCRIPTION |
|---|---|
| A | Email from Katherine A. Blair to Defendants Fortune and Whitworth (February 24, 2026) |
| B | Letter from Dr. Adeyinka Akinsulure-Smith (February 23, 2026) |
| C | Email from Defendant Fortune to Katherine A. Blair (February 25, 2026) |
| D | Directive of Plaintiff Gary Lawrence (February 20, 2026) |
| E | Declaration of Plaintiff Gary Lawrence (March 25, 2026) |
| F | Email from Defendant Fortune to Jonathan Hackworth (January 8, 2026) |
| G | Email from Defendant Fortune to Katherine A. Blair (September 22, 2025) |
| H | Report of Dr. Adeyinka Akinsulure-Smith (March 23, 2026) |

Respectfully submitted,

/s/ Katherine Blair
KATHERINE A. BLAIR

Assistant Chief, Capital Habeas Unit
HEATHER GLOBERMAN
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301
(850) 942-8818
Katherine_Blair@fd.org

*Counsel for Mr. Lawrence*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic mail to counsel for the Defendants, the Office of the Attorney General. Service will be completed upon issuance of the summons.

/s/ Katherine Blair
KATHERINE BLAIR

# APPENDIX A

**From:** Katherine Blair
**To:** BrandyFortune@fcor.state.fl.us; Whitworth, Michelle
**Subject:** Gary Lawrence - clemency
**Date:** Tuesday, February 24, 2026 6:12:36 PM
**Attachments:** image001.png
Lawerence letter Feb 2026.pdf

Good evening, Ms. Fortune and Ms. Whitworth,

Please find attached a set of recommendations from Dr. Adeyinka Akinsulure-Smith, Ph.D., ABPP, which will assist Mr. Lawrence in meaningfully participating in his clemency interview this Friday, February 27. As you may already be aware, Mr. Lawrence suffers from an intellectual disability and a profoundly traumatic background, both of which have bearing on his ability to verbally communicate.
The accommodations suggested by Dr. Akinsulure-Smith are critical to enabling Mr. Lawrence to meaningfully respond to the Clemency Commission's inquiries.

Thank you,

Katherine A. Blair
(she/her/hers)
Assistant Chief – Capital Habeas Unit
Office of the Federal Public Defender
227 N. Bronough St., Ste. 4200
Tallahassee, FL 32301

**ADEYINKA M. AKINSULURE-SMITH, Ph.D., ABPP**
275 West 96th Street, Suite 8D
New York, New York 10025
(917) 332-8904
NYS License # 013405

February 23, 2026

Ms. Katherine Blair, Chief Assistant
Capital Habeas Unit
Office of the Federal Public Defender
227 N. Bronough Street, Suite 4200
Tallahasse, FL 32301

Dear Ms. Blair,

I'm reaching out to share some thoughts based on my meeting with Mr. Lawrence on 11/4/25. These are also informed by our conversations regarding the extensive trauma he experienced during his formative developmental years, and your descriptions of your interactions with him through the years.

Although at times it has been challenging to develop rapport with some of the trauma survivors I have worked with in the past, by drawing on my extensive clinical skills, I have always eventually had success. As I told you, it was very hard for Mr. Lawrence to discuss his history with me. In fact, he became so emotionally distressed that he shut down and was unable to do so. From our brief conversations, I gathered that even though you have worked with him for so many years, Mr. Lawrence has also struggled to share his traumatic history with you.

This type of struggle has been noted in survivors of early adverse experiences. For trauma victims like Mr. Lawrence, who have endured unspeakable acts of violence during formative years, ***shame*** can act as a powerful barrier, causing them to internalize the experience(s), feel "broken" or responsible, and deeply fear judgment by others. This intense emotion drives secrecy, social withdrawal, and a reluctance to seek help.

Because shame is linked to a "freeze" or "dissociation" response, Mr. Lawrence will most likely have difficulty articulating his experiences (as we have already noted) during any type of sustained questioning. In fact, it is highly likely that Mr. Lawrence's memories of those traumatic experiences may be too overwhelming to verbalize, especially if (as I suspect), they were accompanied by extreme humiliation. Furthermore, the fear of stigma and judgment (survivors often fear that sharing their story will lead to blame, disbelief or rejection) is another reason for the reluctance to discuss such painful memories. Finally, please recognize that all of these trauma responses that impede effective communication will be further exacerbated by his intellectual disability diagnosis.

Given these struggles, in order for Mr. Lawrence to perform to the best of his ability during his Clemency Hearing, I suggest that the following adjustments are made:

1. Where possible, present Mr. Lawrence all materials and questions to be asked of him before his hearing so that he can review and process his responses ahead of time as he may become overwhelmed with a myriad of emotions that could impact his memory and verbal capacities (all further compromised by his intellectual disability).

2. Write all information using simple, clear language with short and complete sentences.

3. During his Clemency Hearing, ask all questions slowly, simply, and clearly (again, utilizing short and complete sentences).

4. If he appears “frozen,” “shut down,” or confused; please repeat, reword and/or rephrase questions.

5. Allow time for his responses.

6. Include the opportunity for him to submit additional written responses upon reflection after the Clemency Interview.

7. Permit rest/break periods as needed during the process.

Sincerely,



Adéyínká M. Akinṣulurẹ-Smith, Ph.D., ABPP

# APPENDIX B

**ADEYINKA M. AKINSULURE-SMITH, Ph.D., ABPP**
275 West 96th Street, Suite 8D
New York, New York 10025
(917) 332-8904
NYS License # 013405

February 23, 2026

Ms. Katherine Blair, Chief Assistant
Capital Habeas Unit
Office of the Federal Public Defender
227 N. Bronough Street, Suite 4200
Tallahasse, FL 32301

Dear Ms. Blair,

I'm reaching out to share some thoughts based on my meeting with Mr. Lawrence on 11/4/25. These are also informed by our conversations regarding the extensive trauma he experienced during his formative developmental years, and your descriptions of your interactions with him through the years.

Although at times it has been challenging to develop rapport with some of the trauma survivors I have worked with in the past, by drawing on my extensive clinical skills, I have always eventually had success. As I told you, it was very hard for Mr. Lawrence to discuss his history with me. In fact, he became so emotionally distressed that he shut down and was unable to do so. From our brief conversations, I gathered that even though you have worked with him for so many years, Mr. Lawrence has also struggled to share his traumatic history with you.

This type of struggle has been noted in survivors of early adverse experiences. For trauma victims like Mr. Lawrence, who have endured unspeakable acts of violence during formative years, ***shame*** can act as a powerful barrier, causing them to internalize the experience(s), feel "broken" or responsible, and deeply fear judgment by others. This intense emotion drives secrecy, social withdrawal, and a reluctance to seek help.

Because shame is linked to a "freeze" or "dissociation" response, Mr. Lawrence will most likely have difficulty articulating his experiences (as we have already noted) during any type of sustained questioning. In fact, it is highly likely that Mr. Lawrence's memories of those traumatic experiences may be too overwhelming to verbalize, especially if (as I suspect), they were accompanied by extreme humiliation. Furthermore, the fear of stigma and judgment (survivors often fear that sharing their story will lead to blame, disbelief or rejection) is another reason for the reluctance to discuss such painful memories. Finally, please recognize that all of these trauma responses that impede effective communication will be further exacerbated by his intellectual disability diagnosis.

Given these struggles, in order for Mr. Lawrence to perform to the best of his ability during his Clemency Hearing, I suggest that the following adjustments are made:

1. Where possible, present Mr. Lawrence all materials and questions to be asked of him before his hearing so that he can review and process his responses ahead of time as he may become overwhelmed with a myriad of emotions that could impact his memory and verbal capacities (all further compromised by his intellectual disability).

2. Write all information using simple, clear language with short and complete sentences.

3. During his Clemency Hearing, ask all questions slowly, simply, and clearly (again, utilizing short and complete sentences).

4. If he appears “frozen,” “shut down,” or confused; please repeat, reword and/or rephrase questions.

5. Allow time for his responses.

6. Include the opportunity for him to submit additional written responses upon reflection after the Clemency Interview.

7. Permit rest/break periods as needed during the process.

Sincerely,

Adéyínká M. Akinṣulurẹ-Smith, Ph.D., ABPP

# APPENDIX C

**Katherine Blair**

---

**From:** Fortune, Brandy <BrandyFortune@fcor.state.fl.us>
**Sent:** Wednesday, February 25, 2026 1:52 PM
**To:** Katherine Blair; Whitworth, Michelle
**Subject:** RE: Gary Lawrence - clemency

Your correspondence has been received.

**4070 Esplanade Way**
**Tallahassee, FL 32399-2450**
**www.fcor.state.fl.us**

**Brandy Fortune**
**Capital Punishment Research Specialist**
Florida Commission on Offender Review
brandyfortune@fcor.state.fl.us
Office: 850-487-1175
Direct Line: 850-921-2866

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential or privileged information. Any unauthorized review, use, disclosure, distribution, copying, or other use is prohibited. If you have received this message in error, please notify the sender immediately and then destroy all copies of the original message.

---

**From:** Katherine Blair <Katherine_Blair@fd.org>
**Sent:** Tuesday, February 24, 2026 6:13 PM
**To:** Fortune, Brandy <BrandyFortune@fcor.state.fl.us>; Whitworth, Michelle <MichelleWhitworth@fcor.state.fl.us>
**Subject:** Gary Lawrence - clemency

Good evening, Ms. Fortune and Ms. Whitworth,

Please find attached a set of recommendations from Dr. Adeyinka Akinsulure-Smith, Ph.D., ABPP, which will assist Mr. Lawrence in meaningfully participating in his clemency interview this Friday, February 27.
As you may already be aware, Mr. Lawrence suffers from an intellectual disability and a profoundly traumatic background, both of which have bearing on his ability to verbally communicate.
The accommodations suggested by Dr. Akinsulure-Smith are critical to enabling Mr. Lawrence to meaningfully respond to the Clemency Commission's inquiries.

Thank you,

Katherine A. Blair
(she/her/hers)
Assistant Chief – Capital Habeas Unit
Office of the Federal Public Defender
227 N. Bronough St., Ste. 4200
Tallahassee, FL 32301

# APPENDIX D

**DIRECTIVE OF GARY LAWRENCE**

I, Gary Lawrence, direct my clemency attorney, Jonathan Hackworth, to provide me with a copy of my 2/27/2026 clemency interview transcript. In order to ensure that I may meaningfully participate in this process, I direct Mr. Hackworth to request the transcript immediately following my interview, and to mail me a copy immediately upon receipt. I ask that he notify me by email or other written communication when he has requested the copy of the transcript, and additionally when he has received and mailed it to me. If Mr. Hackworth is unwilling to provide me with this, I direct that he promptly notify me in writing, as well as the basis for his refusal.

Gary Lawrence 2-20-26

Signature Date

GARY LAWRENCE

Printed Name

Sworn and subscribed before me this 20th day of Feb, 2026 by Gary Lawrence, who is personally known to me and has produced the following identification: FL DOC# 039763.

Notary Public, State of Florida

NOTARY PUBLIC STATE OF FLORIDA
ANDREA TINOCO
Commission # HH 380103
Expires May 8, 2027

# APPENDIX
# E

**DECLARATION OF GARY LAWRENCE**
**PURSUANT TO 28 U.S.C. § 1746**

I, Gary Lawrence, hereby testify, affirm and declare as follows:

1. I am a death row prisoner housed at Union Correctional Institution in Raiford, Florida.

2. Attorney Jonathan Hackworth was appointed as my clemency lawyer in late 2025.

3. I had a clemency interview on Friday, February 27, 2026. When I saw Mr. Hackworth in person for the first time on the day of the interview, I handed him a letter directing him to order the transcript from my clemency interview immediately following the interview and to provide me with a copy of that transcript immediately upon receipt.

4. Mr. Hackworth read my directive at our meeting right before the interview on February 27 and told me that he was not allowed to provide me with a copy of the transcript. He then told the commissioners overseeing my interview that I had asked for the transcript, and he was not allowed to give it to me. I don't understand why my lawyer is saying he can't give me a copy of my own interview.

5. I remember very little of was said or asked of me at my clemency interview, so I especially need a copy of the transcript. I know that I was asked questions that I had trouble answering, particularly about my time at the Dozier School for Boys in Marianna, and would like a chance to respond to those questions in a written statement which I was told is due to the commissioners no more than thirty (30) days after my interview.

I hereby certify that the facts set forth are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. §1746.

Gary Lawrence 3-25-26
Gary Lawrence

# APPENDIX F

**From:** Fortune, Brandy
**To:** Jon Hackworth
**Cc:** Megan Parker
**Subject:** RE: James, Edward DC#969121
**Date:** Thursday, January 8, 2026 11:14:51 AM

---

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Mr. Hackworth,

Yes, you are correct you cannot provide a copy of a clemency interview transcript to an inmate nor any inmate representative.

Other than clemency counsel himself or herself, Rule 15.G., does not authorize the production or disclosure of a copy of the clemency interview transcript to an inmate or his or her representative.

Additionally, Rules 15 and Rule 16 dictate that "all records and documents generated and gathered in the clemency process are confidential and shall not be made available for inspection to any person except members of the Clemency Board and their staff." Additionally, both Rules 15 and 16 prohibit disclosure of any record or document gathered in the clemency process absent the express permission of the Governor. No other member of the Clemency Board or "any other state entity" may disclose the same without, again, the express permission of the Governor. Even if such Governor access or authorization is granted, such authorization or grant or approval "does not constitute a waiver of confidentiality."

Additionally, s. 14.28, Fla. Stat., sets out the confidentiality of clemency records—"All records developed or received by any state entity pursuant to a Board of Executive Clemency investigation shall be confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution" and that it is the Governor who controls any such release or disclosure.

Thank you,

**4070 Esplanade Way**
**Tallahassee, FL 32399-2450**
**www.fcor.state.fl.us**

**Brandy Fortune**
**Capital Punishment Research Specialist**
Florida Commission on Offender Review
brandyfortune@fcor.state.fl.us
Office: 850-487-1175
Direct Line: 850-921-2866

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential or privileged information. Any unauthorized review, use, disclosure, distribution, copying, or other use is prohibited. If you have received this message in error, please notify the sender immediately and then destroy all copies of the original message.

---

**From:** Jon Hackworth <jhack@bhtampa.com>

**Sent:** Wednesday, January 7, 2026 9:18 PM
**To:** Fortune, Brandy <BrandyFortune@fcor.state.fl.us>
**Cc:** Megan Parker <mparker@bhtampa.com>
**Subject:** James, Edward DC#969121

Ms. Fortune,

We trust this finds you well. Unfortunately, Mr. James filed a bar complaint against me due to my compliance with the applicable Florida Statutes regarding the confidentiality of the records gathered and produced during the Executive Clemency Process. I explained the same to the representatives of the Florida Bar involved in the complaint. For clarity purposes, I wanted to once again reach out to confirm that I cannot, by law, release these documents to the individual inmate, like Mr. James or his representatives? I apologize for this inconvenience, but I just wanted to verify, as I anticipate forwarding this response to the Florida Bar to aid in their investigation into the issue.

Thank you. Wishing you well.

# APPENDIX
# G

**Katherine Blair**

---

**From:** Fortune, Brandy <BrandyFortune@fcor.state.fl.us>
**Sent:** Monday, September 22, 2025 10:39 AM
**To:** Katherine Blair
**Subject:** RE: Gary Lawrence - clemency interview date?

Good morning, Ms. Blair,

As always you may submit any materials or information at any time directly to me at the following address, 4070 Esplanade Way, Tallahassee, Florida 32399.

Pursuant to section 14.28, Florida Statutes, and Rules 15 and 16, Rules of Executive Clemency, all information and records received, gathered, or generated in the executive clemency process—including disclosure of the existence of a clemency application or related record—are confidential and may not be released without the express permission of the Governor.

Thank you,

**4070 Esplanade Way**
**Tallahassee, FL 32399-2450**
**www.fcor.state.fl.us**

**Brandy Fortune**
**Capital Punishment Research Specialist**
Florida Commission on Offender Review
brandyfortune@fcor.state.fl.us
Office: 850-487-1175

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential or privileged information. Any unauthorized review, use, disclosure, distribution, copying, or other use is prohibited. If you have received this message in error, please notify the sender immediately and then destroy all copies of the original message.

---

**From:** Katherine Blair <Katherine_Blair@fd.org>
**Sent:** Thursday, September 18, 2025 11:34 AM
**To:** Fortune, Brandy <BrandyFortune@fcor.state.fl.us>
**Subject:** Gary Lawrence - clemency interview date?

Hello Ms. Fortune,

I have been notified that my client, Gary Lawrence, has had clemency proceedings initiated.

Could you please apprise me of the date of his clemency interview, so that I know the timeline for submitting materials in support of clemency?

Thank you,

Katie

Katherine A. Blair
(she/her/hers)

Assistant Chief – Capital Habeas Unit
Office of the Federal Public Defender
227 N. Bronough St., Ste. 4200
Tallahassee, FL 32301

# APPENDIX H

**ADÉYÍNKÁ M. AKINṢULURẸ-SMITH, Ph.D., ABPP**
275 West 96th Street, Suite 8D
New York, New York 10025
(917) 332-8904
NYS License # )13405

---

## PSYCHOLOGICAL EVALUATION

THIS INFORMATION IS CONFIDENTIAL

**Name**: Mr. Gary Lawrence
**Date of Birth**: June 29, 1957
**Gender**: Male
**Age**: 68 years
**Dates of Examination**: November 3 2025
**Date of Report**: March 23, 2026

**Referral Question:**

Mr. Gary Lawrence is a 68-year-old male who was tried, found guilty and convicted of first-degree murder and associated charges in Santa Rosa County, Florida (Case No. 1994-CF-397) on March 16, 1995. The jury at his trial recommended death by a 9-3 vote and he was formally sentenced to death on May 5, 1995. Mr. Lawrence has been an inmate on death row since his sentencing and is currently incarcerated at Union Correctional Institution (UCI) in Raiford, Florida.

**Reason for Referral**:

Mr. Lawrence was referred for a psychological evaluation by his legal team at the Office of the Federal Defender for the Northern District of Florida. Specifically, this examiner was retained for the purpose of conducting a trauma-informed psychological assessment, reviewing the psychosocial factors that may have contributed to his actions, and rendering opinions related to his present psychological functioning. This report serves to memorialize those opinions, to a reasonable degree of psychological certainty.

**Case Summary:**

Gary Lawrence is an individual who grew up in extremely toxic environments that lacked any networks of stable, responsive relationships and caregivers with financial, psychological and social resources to nurture and protect him. As a result of his circumstances, from early on Mr. Lawrence struggled with a range of severe and relentless sociocultural hardships, including being raised in a physically, emotionally, and verbally abusive home that was rife with domestic

violence and substance abuse; and enduring multiple additional traumatic life events, all before the age of 18 years. All of these experiences left him unable to cope successfully with frightening or threatening events. Furthermore, the chronic toxic stressors Mr. Lawrence endured conspired to create feelings of powerlessness that have interfered with his daily functioning, and negatively impacted his mental health throughout his life.

The pathological levels of toxic stress repeatedly experienced by Mr. Lawrence during his early formative years, and throughout his adolescence, were further compounded by his well-documented cognitive limitations. Given all of these factors, it is not surprising that these relentless adversities have given rise to impaired reasoning and poor decision-making skills leading to poor judgment that have negatively impacted his life and most likely contributed to his current situation. Moreover, it is important to recognize the interpersonal nature of the traumas he suffered—meaning that the source of the traumas were often other human beings who were supposed to be caretakers.

Current empirical data from the fields of neuroscience, psychology, and sociology regarding brain development, has repeatedly demonstrated the negative impact of polyvictimization on the biopsychosocial development of young people faced with adverse circumstances. This report underscores and discusses the myriad of ways in which his extensive early adverse circumstances, cognitive limitations, and traumatic incarceration in his early years further stalled Mr. Lawrence's brain development and exposed him to extensive abuse (emotional, physical, sexual, and verbal) as well as to negative social influences. All influenced his ability to develop self-control and to mature.

In my professional opinion, the extensive polyvictimization Mr. Lawrence endured throughout his early formative years – from infancy, childhood, and through his adolescence (abusive and neglectful home environment, time at Dozier, incarceration in adult settings) have all contributed to his current situation. These underlying factors likely led to his current death sentence. While these mitigating factors were not taken into account when his death sentence was imposed, it would be impossible to fully understand Mr. Lawrence's case without also considering the severe impact that his experiences of chronic exposure to toxic stress have had on his development.

**Conditions of Evaluation**:

At the beginning of our meeting on November 3, 2025, I identified myself to Mr. Lawrence and then confirmed his name and date of birth. During that encounter I discussed the limits of confidentiality of our meeting. I advised Mr. Lawrence that I would share my findings with his legal team and submit a written report to be used at their discretion. On each of these occasions, Mr. Lawrence agreed to the condition that I approach this evaluation with no particular result in mind and that I would exercise independent professional judgment in all aspects of this evaluation. Mr. Lawrence appeared to understand the limits of confidentiality and consented.

**Sources of Information:**

Data for this report were gathered through a combination of a clinical interview with Mr. Lawrence that was complimented by a comprehensive review of numerous documents regarding Mr. Lawrence's academic, familial, legal, medical, psychological, and social history, including records from:

- Arthur G. Dozier School for Boys, Department of Health and Rehabilitative Services, State of Florida State, Division of Youth Services; Memorandum by Lenox E. Williams, Superintendent to Pace Junior High School
- Defendant's Successive Rule 3.851 Motion for Post-Conviction Relief
- School Records – Florida Cumulative Guidance Records – Grades 1-12
- Affidavits from the following individuals:
  - Joyce Nichols
  - Judy Moon
  - Martina Mable Trease
  - Preston O'Neal Farrington
  - Sharon Roher
  - Steven Eugene Coffey
- Psychological Evaluations:
  - Jethro Toomer, Ph.D. (Dated: 6/13/2018)
  - Michael E. Rappaport, Ph.D. (Dated: 9/20/1999)
  - James D. Larson, Ph.D. (Dated: 2/20/1995)

Each of these sources of information were considered in the writing of this report.

## Abbreviated Background Information

Developmental History

Every record reviewed corroborates the fact that Mr. Gary Lawrence is the youngest child of Mr. Samuel Lee Lawrence and Mrs. Nola Ann Lawrence's seven children and that he was raised in an extremely chaotic and toxic environment, rife with domestic violence as well as chronic emotional, physical, verbal abuse and neglect. These records also document the fact that both parents were alcoholics. In his early adolescence, Mr. Lawrence was sent to Arthur G. Dozier School for Boys where he was exposed further to unspeakable emotional, physical, verbal and sexual abuse.

Academic History

Along with his obvious intellectual deficits, all records reviewed (especially academic, psychological, and affidavits of family and friends) underscored a history of educational deprivation and emotional neglect. Mr. Lawrence's Florida Cumulative School Records is replete with comments by his teachers that point to his academic struggles, "*Gary just CAN'T do his work. He sits and does nothing the whole day. It would not have helped to retain him, so he*

*was passed*" (Morrow, 1967-1968); "*No progress this year. Seems to have serious problems at home*" (Rogers, 1970-1971); "*Gary sits in class and does nothing. Dropped out of school*" (Ervin, 1971-1972). Unfortunately, suggestions by his teachers such as Mrs. Morrow, "*Gary's IQ needs to be re-tested to see if he qualifies for "special education" classes. That would be the best place for him*" (a note on 6/3/1968), went unnoticed.

When Mr. Lawrence was eventually tested by James Larson, Ph.D., at age **37**, he earned scores "*normally associated with borderline intellectual functioning…at the level normally expected for 9- to 11-year-olds*" (February 20, 1995, p. 5). Dr. Larson's findings were echoed in a report by Dr. Jethro Toomer who concluded, "*Mr. Lawrence meets the diagnostic criteria for a diagnosis of intellectual disability. Mr. Lawrence has 'significantly subaverage intellectual functioning, and a qualifying score within the accepted intellectual disability range, adaptive deficits, and his disability had its onset prior to age 18*" (June 13, 2018, p. 6).

<u>Employment History</u>

During our meeting, Mr. Lawrence reported a very limited work history. The few that he described were jobs requiring repetitive and redundant tasks. His report was confirmed by records reviewed and affidavits by family and friends indicating that he depended on others for financial support.

<u>Social and Interpersonal History</u>

Mr. Lawrence reported a very narrow social support network throughout his life.

<u>Substance Use History</u>

A child of alcoholic parents, Mr. Lawrence has a well-documented history of polysubstance misuse, influenced by his parents, which started early in his childhood and served as a longstanding coping strategy to deal with his multiple traumatic experiences

<u>Mental Health History</u>

In reviewing Mr. Lawrence's history, it is important to recognize that not only was he was raised in extremely chaotic and toxic environment, but that his history of multiple, well documented, devastating traumatic experiences was never addressed. No one ever attempted to give him the tools to support his mental health. It is clear that he struggled by himself to address the inner turmoil he experienced with inadequate coping strategies, including efforts to deny and/or ignore any resulting distressing thoughts, feelings or behaviors via polysubstance abuse. These meagre efforts were further compounded by his cognitive limitations as repeatedly demonstrated by his poor judgment, poor impulse control and utter dependence on others around him.

Mr. Lawrence was never provided with any resources to mitigate the impact of these horrendous experiences on his development. There is no documented evidence of efforts to

provide him with any type of social or mental health services or to understand the impact of these devastating stressors on his socio-emotional functioning.

Physical Health History

In his report of September 20, 1999, Dr. Rappaport noted that Mr. Lawrence had a history of two significant closed head injuries. Traumatic head injuries have been well known to severely impair cognitive functioning.

**Behavioral Observations and Mental Status Exam**

Mr. Lawrence only agreed to meet with me once. On November 3, 2025 he was brought to the room wearing his institutional issued orange uniform and black shoes. His hands were shackled to his waist and his feet were shackled together. Mr. Lawrence presented as a slight, balding man with a scraggly beard and missing teeth.

Socially, Mr. Lawrence struggled to engage in reciprocal social interactions or reciprocal conversation with this examiner. He wore glasses that were held together by string. He was unable to make consistent eye contact throughout our meeting. As Mr. Lawrence reported his predominant language to be English, our meeting was conducted in English. He warned me from the start, "*I don't talk much*." Mr. Lawrence's speech was clear, coherent, and logical. He spoke slowly, in a normal rhythm and rate, and his expressive speech was comprehensible; however, his verbal fluency was meagre. He did not offer any information, but politely responded to questions asked of him with monosyllabic responses or short, terse sentences. Receptively, he seemed to struggle to hear or understand what was said (he often asked me to repeat what I had said).

Although, there was no noticeable disturbance of activity levels, Mr. Lawrence seemed exhausted. Later, as he became increasingly withdrawn, he informed me that he was "tired of it" and did not want to talk about his case as he saw no reason to dredge up the past. When I pressed him further, Mr. Lawrence informed me that as he saw other longtime inmates executed, he had experienced an increasing sense of hopelessness. Before terminating our meeting, Mr. Lawrence admitted that he had become increasingly isolated, had withdrawn and had stopped calling his sister. Mr. Lawrence appeared to be sinking into a deep depression.

Overall, Mr. Lawrence's mood was despairing and his affect was constricted, both appropriate to the content of our discussion and consistent with post-traumatic stress disorder symptomatology. No impairments in reality contact were evident at any time (such as hearing voices when nobody is present), paranoia, bizarre thoughts, or other psychotic symptoms. No delusional beliefs (false views that persist even in the face of contrary evidence) were elicited.

Mr. Lawrence's responses to questions asked of him appeared to be free of any deliberate attempts to present a distorted picture. What information he did provide in our meeting regarding his personal history and current experiences, was in an unrehearsed fashion with logic and attention to the best of his limited capacities.

## Psychological Findings

A wide variety of symptoms are associated with childhood and adult interpersonal victimization (including mood disturbances[1], somatization[2], identity disturbance[3], difficulties in emotional regulation[4], insecure attachment[5], chronic interpersonal difficulties[6], dissociation[7], substance abuse[8], suicidal thoughts and behaviors[9], and tension reduction or externalizing activities[10]). Given Mr. Lawrence's history of multiple interpersonal traumas, typically administration of a measure that is limited to PTSD or some other single symptom or syndrome is unlikely to be sufficient to form an accurate or comprehensive clinical view, thus a battery of instruments would be administered along with an extensive clinical interview. Unfortunately, because his experiences of extensive interpersonal violence have impacted his ability to trust, Mr. Lawrence froze and beyond giving me very basic information, he was unable to discuss any part of his history directly. Thus, beyond reviewing his records in detail, I relied on the Adverse Childhood Experiences (ACE[11]) scale to document his numerous adverse childhood experiences.

The ACE is a 10-item instrument used to identify childhood experiences of abuse and neglect. The instrument measures 10 types of childhood trauma. Five are personal (physical abuse, verbal abuse, sexual abuse, physical neglect, and emotional neglect) and five are related to other family members (a parent who's an alcoholic, a mother who's a victim of domestic violence, a family member in jail, a family member diagnosed with a mental illness, and the disappearance of a parent through divorce, death or abandonment). Each type of trauma counts

---

[1] Dworkin, E. R., Menon, S. V., Bystrynski, J., & Allen, N. E. (2017). Sexual assault victimization and psychopathology: A review and meta-analysis. *Clinical psychology review*, *56*, 65-81.

[2] Dietrich, A. (2003). Characteristics of child maltreatment, psychological dissociation, and somatoform dissociation of Canadian inmates. *Journal of Trauma & Dissociation*, *4*(1), 81-100.

[3] Briere, J., & Rickards, S. (2007). Self-awareness, affect regulation, and relatedness: Differential sequels of childhood versus adult victimization experiences. *The Journal of nervous and mental disease*, *195*(6), 497-503.

[4] Van der Kolk, B. A., Pelcovitz, D., Roth, S., & Mandel, F. S. (1996). Dissociation, somatization, and affect dysregulation: The Complexity of adaption to trauma. *The American journal of psychiatry*.

[5] Cloitre, M., Stovall-McClough, C., Zorbas, P., & Charuvastra, A. (2008). Attachment organization, emotion regulation, and expectations of support in a clinical sample of women with childhood abuse histories. Journal of Traumatic Stress: Official Publication of The International Society for Traumatic Stress Studies, 21(3), 282-289.

[6] Pietrzak, R. H., Goldstein, M. B., Malley, J. C., Johnson, D. C., & Southwick, S. M. (2009). Subsyndromal posttraumatic stress disorder is associated with health and psychosocial difficulties in veterans of Operations Enduring Freedom and Iraqi Freedom. *Depression and anxiety*, *26*(8), 739-744.

[7] Briere, J., Scott, C., & Weathers, F. (2005). Peritraumatic and persistent dissociation in the presumed etiology of PTSD. *American Journal of Psychiatry*, *162*(12), 2295-2301.

[8] Ouimette, P. E., & Brown, P. J. (2003). *Trauma and substance abuse: Causes, consequences, and treatment of comorbid disorders*. American Psychological Association.

[9] Panagioti, M., Gooding, P. A., & Tarrier, N. (2012). A meta-analysis of the association between posttraumatic stress disorder and suicidality: the role of comorbid depression. *Comprehensive Psychiatry*, *53*(7), 915-930.

[10] Briere, J., & Gil, E. (1998). Self-mutilation in clinical and general population samples: Prevalence, correlates, and functions. *American journal of Orthopsychiatry*, *68*(4), 609-620.

[11] Foege, W. H. (1998). Adverse childhood experiences. *A public health perspective. Am J Prev Med*, *14*(4), 354-55.

as one. An ACE of 4 or more is of concern[12, 13]. As has been documented throughout the psychological literature, the higher the individual's ACE score, the higher the risk for health and social and emotional problems. While I was unable to administer this measure directly to him, based on the records reviewed, Mr. Lawrence earned a score of "10" out of 10, indicating childhood exposure to all **TEN** of the ten categories used to identify childhood incidents of abuse and neglect.

While the ACE scale is among the gold standard instruments for assessing adverse childhood experiences, it does have some shortcomings. One limitation is a narrow range of childhood adversities covered, such as the exclusion of bullying. Another example is restricting witnessing domestic violence to mothers and stepmothers, and excluding witnessing such behavior towards siblings. Another limitation is the low number of items, only 10, making it easier to apply in many circumstances but does not capture other critical ones. Finally, the ACE does not include information on timing and duration of exposure or of how exposure levels change across development. However, the instrument does capture the traumas he experienced **before** the age of 18.

All the records reviewed provided evidence not only of the toxic environments Mr. Lawrence grew up in during his childhood and his adolescent years, but highlight the types of adverse experiences he repeatedly endured by those who should have been protecting and caring for him (e.g., physical, sexual, and verbal abuse, bullying, educational neglect, and abandonment).

## Diagnostic Considerations

### Impact of Adverse Early Childhood Experiences

As documented above, Mr. Lawrence endured a myriad of adverse early childhood experiences. Through the emerging research in this field, we now know that early adversity can impact the brain's development, structure and functioning, predisposing some individuals to maladaptive functioning in certain domains[14]. The human brain's prolonged course of development not only reflects a long period of juvenility, but also a long period of malleability. Environmental factors, and experiences, can impact the course of the brain's development. Adverse experiences, including neglect, poverty, and abuse, have demonstrable effects on the developing brain[15].

Through current research, we now understand that individuals, like Mr. Lawrence, who experience early and chronic adversity are at increased risk for developing mental health

---

[12] www.AcesTooHigh.com
[13] www.acestudy.org
[14] Berens, A. E., Jensen, S. K., & Nelson, C. A. (2017). Biological embedding of childhood adversity: from physiological mechanisms to clinical implications. *BMC medicine*, *15*(1), 1-12.
[15] Nelson III, C. A., & Gabard-Durnam, L. J. (2020). Early adversity and critical periods: Neurodevelopmental consequences of violating the expectable environment. *Trends in Neurosciences*, *43*(3), 133-143.

disorders[16]. Having said this, subsequent research on ACE scores has demonstrated that individuals, like Mr. Lawrence, with multiple ACEs have more psychological and mental health issues including depression, anxiety, post-traumatic stress disorder, eating disorders, insomnia, substance abuse, and conduct disorder[17]. It is also important to understand that individuals like Mr. Lawrence who have a history of trauma exposure (especially for those who have experienced complex repeated events with a high degree of betrayal), particularly when the source of trauma was (were) another human being(s) tend to develop an extremely cautious relational stance and will most likely be distrustful of other people's intent towards them. This reluctance to open up to should be considered adaptive as it is his way of reducing the likelihood of revictimization[18].

*Importance of Protective Factors in Outcomes for Individuals who have Suffered ACEs*

While ACEs increase the risk of chronic disease and mental health issues, the presence of protective factors can act as a "shield" or "buffer," building resilience that can significantly mitigate the long-term negative health and behavioral outcomes associated with toxic stress, allowing individuals to adapt and even thrive despite early trauma. Such protective factors are important because they can do the following: i) Neutralizing Stress (help children feel safe more quickly after experiencing "toxic stress," which can neutralize the harmful physiological and brain development changes that naturally occur during trauma; ii) Moderating Outcomes (high levels of protective factors can dramatically reduce risk. For example, youth with high ACE scores but also high protective factors have an 80% lower risk of depressive symptoms compared to those without those protections); and iii) Improving Adult Health (adults who grew up with at least one person who made them feel safe are significantly less likely to report frequent mental distress or poor physical health, even with high childhood ACE scores).

Key Types of Protective Factors have been well noted and are often categorized by the level at which they occur:

- Individual Factors
    - Self-Regulation: The ability to manage and name emotions is one of the strongest predictors of positive mental health in those with ACEs.
    - Mastery and Self-Efficacy: Having a sense of control over one's life and confidence in problem-solving.
- Interpersonal & Family Factors
    - The Power of One: A stable relationship with at least one caring, supportive adult is considered the most critical protective factor.

---

[16] Kessler, R. C., McLaughlin, K. A., Green, J. G., Gruber, M. J., Sampson, N. A., Zaslavsky, A. M., ... & Williams, D. R. (2010). Childhood adversities and adult psychopathology in the WHO World Mental Health Surveys. *The British journal of psychiatry*, *197*(5), 378-385.

[17] Chapman, D. P., Dube, S. R., & Anda, R. F. (2007). Adverse childhood events as risk factors for negative mental health outcomes. Psychiatric Annals, 37, 359–364.

[18] Ford, J. D., & Courtois, C. A. (2020). Defining and understanding complex trauma and complex traumatic stress disorders. In J. D. Ford & C. A. Courtois (Eds.), Treating complex traumatic stress disorders in adults: Scientific foundations and therapeutic models (2nd ed.; pp. 3–34). The Guilford Press.

- Predictable Routines: Household rules and routines help children feel secure by knowing what to expect.
- Community & Social Factors
  - Safe Environments: Living in safe, stable housing and neighborhoods where residents look out for one another.
  - Social Connections: Participation in community traditions, sports, or faith groups provides a sense of belonging and "social capital".
  - Concrete Support: Access to essential services like healthcare, mental health support, and financial stability.

A comprehensive review of Mr. Lawrence's records confirms a total absence of any of these protective factors throughout his developmental years and beyond. It is important to note that while these protective factors are crucial during development, the Adult PACEs Plan[19] suggests that adults can still benefit from building Protective and Compensatory Experiences (PACEs). These include strengthening current relationships, imposing structure on daily life, and seeking trauma-informed therapy to "break the cycle" of trauma. Mr. Lawrence's life experiences have been totally devoid of such opportunities.

Increasingly research published since 2000 has pointed to the negative effects of incarcerating youth offenders in adult facilities. In fact, it has been noted that the restrictive and often traumatic environment of prison can halt brain development, worsen existing trauma, disrupt education, expose youth to negative social influences and hinder social and emotional growth. Taken together, these factors make it difficult for them to develop self-control and a prosocial identity, thereby increasing the changes of future incarceration. Unfortunately, as in the case of Mr. Lawrence, his past experiences in many ways contributed to his current situation.

While this section of this report highlights specific areas of his development that were impacted by his incarceration among adult offenders at a key developmental time in his life, this has to be placed within the context of adolescent brain development.

**Victimization within the Florida State Prison System**

Abuse is prevalent within adult prisons. Although both youth and adult offenders experience significant levels of victimization, involving verbal, physical, sexual, and emotional abuse[20, 21], juvenile offenders incarcerated in adult prisons may be at particular risk of

---

[19] Morris, A. S., & Hays-Grudo, J. (2023). Protective and compensatory childhood experiences and their impact on adult mental health. *World Psychiatry*, *22*(1), 150.

[20] Spataro, J., Mullen, P. E., Burgess, P. M., Wells, D. L., & Moss, S. A. (2004). Impact of child sexual abuse on mental health: prospective study in males and females. *The British Journal of Psychiatry*, *184*(5), 416-421.

[21] Young, M. S., Harford, K. L., Kinder, B., & Savell, J. K. (2007). The relationship between childhood sexual abuse and adult mental health among undergraduates: Victim gender doesn't matter. *Journal of Interpersonal Violence*, *22*(10), 1315-1331.

victimization due to their age and developmental level[22, 23]. It is likely that adult inmates in the system may have greater physical strength, a longer criminal history, and more experience of incarceration than juvenile offenders, suggesting some inherent risk to youth within adult correctional facilities. Mr. Lawrence's experiences of repeated threatened and actual violence highlight his significant vulnerability that resulted in recurrent traumatic victimization at that time.

**Research documenting programs and policies that reduce incarceration in ways that lessen delinquent behavior and improve young people's well-being**

Since Mr. Lawrence's repeated incarcerations at a young age, there has been much research related to best practices for rehabilitating juvenile offenders. The Pathways to Desistance Study[24] is a large collaborative, multidisciplinary project that is following 1,354 serious juvenile offenders ages 14–18 (184 females and 1,170 males) for 7 years after their conviction. This study has collected the most comprehensive data set currently available about serious adolescent offenders and their lives in late adolescence and early adulthood. It looks at the factors that lead youth who have committed serious offenses to continue or desist from offending, including individual maturation, life changes, and involvement with the criminal justice system.

The primary findings of the study to date deal with the decrease in self-reported offending over time by most serious adolescent offenders, the relative inefficacy of longer juvenile incarcerations in decreasing recidivism, the effectiveness of community-based supervision as a component of aftercare for incarcerated youth, and the effectiveness of substance abuse treatment in reducing both substance use and offending by serious adolescent offenders. Longer stays in juvenile institutions do not reduce recidivism, and some youth who had the lowest offending levels reported committing more crimes after being incarcerated. In fact, when the researchers matched groups of offenders with similar backgrounds, they found that, for lengths of stay between 3 and 13 months, youth who stayed in institutions longer showed little or no decrease in their rates of rearrest compared with those with shorter stays[25].

Other studies have indicated that youth who are imprisoned have higher recidivism rates than youth who remain in communities, both due to suspended opportunities for education and a disruption in the process that normally allows many youths to "age-out" of crime. Behavioral scientists are finding that bringing youth together for treatment or services may make it more likely that they will become engaged in delinquent behavior. Nowhere are deviant youth brought together in greater numbers and density than in detention centers, and correctional facilities. Researchers at the Oregon Social Learning Center found that congregating youth together for treatment in a group setting causes them to have a higher recidivism rate and poorer outcomes than youth who are not grouped together for treatment. The researchers call this process "peer deviancy training," and reported statistically significant higher levels of substance abuse,

---

[22] Easton, S. D., Saltzman, L. Y., & Willis, D. G. (2014). "Would you tell under circumstances like that?": Barriers to disclosure of child sexual abuse for men. *Psychology of Men & Masculinity*, *15*(4), 460.

[23] Kia-Keating, M., Grossman, F. K., Sorsoli, L., & Epstein, M. (2005). Containing and Resisting Masculinity: Narratives of Renegotiation Among Resilient Male Survivors of Childhood Sexual Abuse. *Psychology of Men & Masculinity*, *6*(3), 169.

[24] Mulvey, E. P. (2011). Highlights from pathways to desistance: A longitudinal study of serious adolescent offenders.

[25] Loughran, T. A., Mulvey, E. P., Schubert, C. A., Fagan, J., Piquero, A. R., & Losoya, S. H. (2009). Estimating a dose-response relationship between length of stay and future recidivism in serious juvenile offenders. *Criminology*, *47*(3), 699-740.

school difficulties, delinquency, violence, and adjustment difficulties in adulthood for those youth treated in a peer group setting[26]. Community-based supervision, as a component of aftercare is effective for youth who have committed serious offenses, and offenders who receive community-based services following incarceration are more likely to attend school, go to work, and reduce offending[27]. This, alongside adolescent brain research, is why matching appropriate services to youth's needs, is so important.

At the time, Mr. Lawrence's greatest need to reduce recidivism was to gain access to services that would have helped him develop the social maturity, cohesive identity, and healthy social support networks that would have allowed for independent thinking and sound judgement so that he would not have been swept away by poor impulse control. Bearing in mind the factors discussed above, what Mr. Lawrence needed at the time was the correct dose of services rather than a set sentence among adult prisoners. Unfortunately, even though he could have benefited from them, such services were not available at the time.

## Adolescent Brain Development

Although Mr. Lawrence, now a 68-year-old adult, was an adult at the time of the crime underlying his current sentence, an individualized understanding of him requires consideration of adolescent brain development. This is because the circumstances that led to his current situation began well before he entered adulthood and were never addressed in a healthy way, which had a significant deleterious impact on his life trajectory. A significant portion of brain growth and development occurring from 18-25 is the construction and strengthening of regional neurocircuitry and pathways; in particular, the brain stem, cerebellum, occipital lobe, parietal lobe, frontal lobe, and temporal lobe actively mature during adolescence. The frontal lobes are involved in movement control, problem solving, spontaneity, memory, language, initiation, judgment, impulse control, and social and sexual behavior.

It is important to understand that from 12-25, the brain undergoes a process of restructuring to make the brain more efficient for adult tasks. At puberty, it begins a reorganization process wherein the connections of the brain that are not used frequently are pruned away to make room for the additional connections it needs to make. It also prepares the brain to process and work more efficiently. During this time, some connections are lost and due to the upcoming developmental tasks, such as needing to become independent and try new things, our brain is structured to be more risk-taking and impulsive, or else teenagers would never leave their homes and venture out on their own.

Many adults do not understand why teenagers occasionally behave in an impulsive, irrational, or dangerous way. At times, it seems like teens don't think things through or fully consider the consequences of their actions. Adolescents differ from adults in the way they

---

[26] Fisher, P. A., & Gilliam, K. S. (2012). Research into theory into practice: an overview of family based interventions for child antisocial behavior developed at the Oregon Social Learning Center. *Clinica y salud*, *23*(3), 247.

[27] Chung, L., Schubert, C.A., and Mulvey, E.P. 2007. An empirical portrait of community reentry among serious juvenile offenders in two metropolitan cities. Criminal Justice and Behavior 34(11):1402–1426.

behave, solve problems, and make decisions. There is a biological explanation for this difference. Studies have shown that brains continue to mature and develop throughout childhood and adolescence and well into early adulthood (about 25 years old).

When considering long-term consequences for adolescents/ young adults, it is always important to understand brain development in adolescents. Current empirical evidence from the behavioral sciences suggests that adolescents differ from adults and children in three important ways that lead to differences in behavior. First, adolescents lack mature capacity for self-regulation in emotionally charged contexts, relative to adults and children.[28] Second, adolescents have a heightened sensitivity to proximal external influences, such as peer pressure and immediate incentives, relative to adults.[29] Third, adolescents show less ability to make judgments and decisions that require future orientation.[30,31].

The combination of these three cognitive patterns accounts for the tendency of adolescents/ young adults to prefer and to engage in risky behaviors that have a high probability of immediate reward, but in parallel can lead to harm to self or to others. The preference for risky behaviors rises by a third of a standard deviation between ages 10 and 16, and then it declines by a half standard deviation by age 26. One can conclude from the body of behavioral and brain studies that adolescents through age 25 clearly differ from adults in crucial ways that suggest the need for a different response from the justice system.

Scientists have identified a specific region of the brain called the amygdala that is responsible for immediate reactions including fear and aggressive behavior. This region develops early. However, the frontal cortex, the area of the brain that controls reasoning and helps us think before we act, develops later. This part of the brain is still changing and maturing well into adulthood. Other changes in the brain during adolescence include a rapid increase in the connections between the brain cells and making the brain pathways more effective. Nerve cells develop myelin, an insulating layer that helps cells communicate.

All these changes are essential for the development of coordinated thought, action, and behavior. Changing brains mean that adolescents act differently from adults. Pictures of the brain in action show that adolescents' brains work differently than adults' when they make decisions or solve problems. Their actions are guided more by the emotional and reactive amygdala and less by the thoughtful, logical frontal cortex. It doesn't mean adolescents/ young adults can't make a rational decision or appreciate the difference between right and wrong. It does mean, particularly when confronted with stressful or emotional decisions, they are more

---

[28] Somerville, L. H., Fani, N., & McClure-Tone, E. B. (2011). Behavioral and neural representation of emotional facial expressions across the lifespan. *Developmental neuropsychology*, *36*(4), 408-428.

[29] Gardner, M., & Steinberg, L. (2005). Peer influence on risk taking, risk preference, and risky decision making in adolescence and adulthood: an experimental study. *Developmental psychology*, *41*(4), 625.

[30] Figner, B., Mackinlay, R. J., Wilkening, F., & Weber, E. U. (2009). Affective and deliberative processes in risky choice: age differences in risk taking in the Columbia Card Task. *Journal of Experimental Psychology: Learning, Memory, and Cognition*, *35*(3), 709.

[31] Steinberg, L. (2009). Adolescent development and juvenile justice. *Annual review of clinical psychology*, *5*(1), 459-485.

likely to act impulsively on instinct, without fully understanding or analyzing the consequences of their actions.

The inexplicable behavior and poor judgments teens are known for almost always happen when teens are feeling high emotion or intense peer pressure, conditions that overwhelm the still-maturing circuitry in the front part of the brain. Mr. Lawrence's poor judgment and impulsive behavior likely contributed to his decision-making difficulties and criminal activities. Teenagers/ young adults have been found to be poor decision-makers if they feel pressured, stressed or are seeking attention from peers. So, it's reasonable to expect a 17-year-old to know they should not steal. But they are less adept at choosing not to steal in the presence of coaxing peers whom they wish to impress. The difference between what teenagers/ young adults know and what they choose can be explained in terms of "cold" and "hot" situations.

Cold situations are choices made during times of low emotional arousal. During these periods, teenagers/ young adults can make well-reasoned and rational decisions. Hot situations refer to choices during periods of high emotional arousal (feeling excited, anxious, or upset). Hot situations increase the chance of engaging in risk-taking and sensation-seeking behaviors, with little self-control or consideration of the possible consequences of their actions. The impact of emotional arousal on decision-making explains why teenagers/ young adults might discuss, for example, the negative consequences associated with drinking and drug-taking, but then engage in those very behaviors when with friends.

Each individual brain develops at a different rate, depending on the onset of puberty and other environmental factors. Researchers have found that girls' brains develop much faster than boys' brains, as much as 10 years earlier. Researchers found that girls' brains can begin maturing from the age of 10 while some men must wait until 20 before the same organizational structures will begin to develop. This is why girls often seem much more mature and why boys will make riskier decisions through young adulthood.

Studies indicate that many adolescents and young adults demonstrate an exaggerated susceptibility to peer influences on risk-relevant decision making. Research has long indicated that adolescents are more likely than adults to take risks in the context of peer groups (rather than alone), and one of the best documented predictors of adolescents'/ young adults' risky behavior is the behavior of their peers. Scholars have shown that emerging adults (age 18–25) also engage in high rates of risky decision-making and further state that emerging adults are just as prone to peer influence as are adolescents.

Based on the stage of their brain development, adolescents are more likely to:

- act on impulse
- misread or misinterpret social cues and emotions
- get into accidents of all kinds
- get involved in fights
- engage in dangerous or risky behavior

Adolescents are less likely to:
- think before they act
- pause to consider the consequences of their actions
- change their dangerous or inappropriate behaviors

Unfortunately, Mr. Lawrence did not get the necessary support he should have had during his childhood and adolescent years. His behavior was merely seen as problematic and he was repeatedly sent off to toxic environments that further aggravated his struggles, leaving him with limited positive interpersonal relationships, placing him in situations in which he had little choice but to act impulsively in order to survive, and leading to misinterpretation of social cues and an inability to manage intense emotions appropriately. Ultimately, over time several complicated factors have led to repeated impulsive actions, poor choices, and poor decision making and planning that have placed him in his current predicament.

For the purpose of this psychological evaluation, the review of the records offers additional quantitative information in support to the findings of the clinical interview. Results of this evaluation were consistent with a history of a diagnosis of Posttraumatic Stress Disorder (PTSD). The *Diagnostic and Statistical Manual of Mental Disorders-5th Edition Text Revision* (DSM-5-TR) defines the qualifying trauma criterion for PTSD as "exposure to actual or threatened death, serious injury, or sexual violence." In his case, throughout his formative years Mr. Lawrence was exposed to extensive trauma. Today, the classic symptoms have been overtaken by his growing fear of his own imminent execution.

**Diagnostic Impression** *(DSM-5-TR):*

In my professional opinion, informed by data gathered from the clinical interview the extensive records reviewed, Mr. Lawrence has experienced and continues to suffer from numerous symptoms of PTSD resulting from all the earlier documented traumatic experiences. These symptoms continue to significantly impact his daily functioning and the quality of his life, and cause him daily suffering.

Mr. Lawrence's history of polyvictimization, presentation and symptoms are consistent with those of individuals who have suffered the severe and extensive physical and emotional traumas that he reports. Currently he meets the following diagnostic criteria according to the *Diagnostic and Statistical Manual of Mental Health Disorders, Fifth Edition Text Revision (DSM-5-TR)*:

| | |
|---|---|
| 309.81 (F43.10) | Posttraumatic Stress Disorder, Chronic (by history) (ICD-11 Complex Posttraumatic Stress Disorder) |
| 294. 9 | Cognitive Disorder NOS (by history) |
| 304.80 | Polysubstance Dependence, In Remission In Controlled Environment (by history) |
| 319 | Unspecified Intellectual Disability (by history) |

| | |
|---|---|
| V15.41 (Z62.810) | Personal History of physical abuse in childhood (by history) |
| V15.41 (Z62.810) | Personal History of sexual abuse in childhood (by history) |
| V15.49 (Z91.49) | Other Personal History of Psychological Trauma (by history) |
| V62.5 (Z65.1) | Imprisonment and other incarceration |
| Z65.3 | Problems Related to Other Legal Circumstances |

**Conclusions**

During the present evaluation Mr. Lawrence answered all questions to the best of his ability, and appeared genuine in his presentation (i.e., he did not attempt to exaggerate or feign impairment). His presentation is supported by a comprehensive review of multiple records, suggesting that overall, the results of this evaluation represent a valid and accurate presentation of his actual level of functioning and underscore the extensive stress he was exposed to and continues to endure.

Trauma, toxic stress and severe cognitive limitations have been shown to impair communication of remorse and responsibility by narrowing focus, deactivating the prefrontal cortex[70], and triggering defensive behaviors, making it difficult to express sincere apologies or accept accountability. Instead of thoughtful reflection, a stressed individual may become defensive, shut down, lash out with regretful words, or even become indecisive, all of which undermine genuine remorse and the ability to clearly own their actions. In Mr. Lawrence's case, his chaotic and stress-filled developmental years in an adult Florida prison stunted his development and may have contributed significantly to his ineffective communication under the duress of his clemency hearing.

Furthermore, for someone with Mr. Lawrence's cognitive limitations, when such stress levels are high, impairments in the ability open up and to convey thoughts clearly and listen attentively can interfere with logical decision making, making it hard to think clearly, resolve issues or make sound decisions.

As I stated in my letter to you dated February 23, 2026,

*"…it was very hard for Mr. Lawrence to discuss his history with me. In fact, he became so emotionally distressed that he shut down and was unable to do so. From our brief conversations, I gathered that even though you have worked with him for so many years, Mr. Lawrence has also struggled to share his traumatic history with you.*

*This type of struggle has been noted in survivors of early adverse experiences. For trauma victims like Mr. Lawrence, who have endured unspeakable acts of violence during formative years,* ***shame*** *can act as a powerful barrier, causing them to internalize the experience(s), feel "broken" or responsible, and deeply fear judgment by others. This intense emotion drives secrecy, social withdrawal, and a reluctance to seek help.*

> *Because shame is linked to a "freeze" or "dissociation" response, Mr. Lawrence will most likely have difficulty articulating his experiences (as we have already noted) during any type of sustained questioning. In fact, it is highly likely that Mr. Lawrence's memories of those traumatic experiences may be too overwhelming to verbalize, especially if (as I suspect), they were accompanied by extreme humiliation. Furthermore, the fear of stigma and judgment (survivors often fear that sharing their story will lead to blame, disbelief or rejection) is another reason for the reluctance to discuss such painful memories. Finally, please recognize that all of these trauma responses that impede effective communication will be further exacerbated by his intellectual disability diagnosis."*

In my professional opinion, Mr. Lawrence's presentation is consistent with the experiences of individuals who have experienced polyvictimization as a result of his toxic history and incarceration during critical developmental stages of his life. These stressors remain extreme and long-lasting. I strongly recommend that the impact of the polyvicitmization he has endured throughout his life, what he has suffered while in the care of the Dozier School for Boys and Florida adult-prison system, and his cognitive deficits be taken into account when analyzing Mr. Lawrence's overall mental health and when considering his growth trajectory since his incarceration on death row.



Adéyínká M. Akinṣulurẹ-Smith, Ph.D., ABPP
Psychologist, New York State License #013405