# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**GARY LAWRENCE**

     Plaintiff,

     v.

**RON DESANTIS**, Governor,
    in his official capacity;

**BLAISE INGOGLIA**, Chief Financial Officer,
    in his official capacity;

**JAMES UTHMEIER**, Attorney General,
    in his official capacity;

**WILTON SIMPSON**, Commissioner of Agriculture,
    in his official capacity;

**DAVID WYANT**,
    Chairperson, Florida Commission on Offender Review,
    in his official capacity;

**RICHARD D. DAVIDSON**,
    Commissioner, Florida Commission on Offender Review,
    in his official capacity;

**S. MICHELLE WHITWORTH**,
    Vice Chair, Florida Commission on Offender Review,
    in her official capacity;

**BRANDY FORTUNE**,
    Research Specialist, Florida Commission on Offender Review,
    in her official capacity;

Case No. 4:26-cv-193

**CAPITAL CASE**

**IAN BERRY**,
> Coordinator, Office of Executive Clemency,
> in his official capacity;

**STEPHEN HEBERT**,
> Director, Office of Clemency Investigations,
> in his official capacity.

> Defendants.

_____/

## MEMORANDUM IN SUPPORT OF 42 U.S.C. § 1983 COMPLAINT

### I.    Introduction

Plaintiff Gary Lawrence, a death-sentenced Florida prisoner, was subjected to a clemency interview on February 27, 2026, and told that his clemency counsel would be submitting something on his behalf approximately 30 days later pursuant to the Rules of Executive Clemency. While Mr. Lawrence has never been privy to what his clemency counsel purportedly submitted, nor received documentation of the deadlines for submission, he presumes that he is currently warrant-eligible under Florida's capital scheme. Mr. Lawrence filed a 42 U.S.C. § 1983 complaint in this Court, seeking declaratory and injunctive relief unless and until he is provided a transcript of his February 27, 2026, clemency interview. This is Mr. Lawrence's memorandum of law in support of the complaint.

## II.    Legal standard for 42 U.S.C. § 1983 claims

To establish a § 1983 cause of action, a plaintiff must show two things: (1) that he has been deprived of a federal or statutory right; and (2) the deprivation was caused by a person acting under color of state law. *Lindke v. Freed*, 601 U.S. 187, 194-95 (2024). "[I]n a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical[.]" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 (1982).

Initial pleadings under § 1983 "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Eleventh Circuit Court of Appeals has specified that a plaintiff "allege some factual detail as a basis for a § 1983 claim." *Keating v. City of Miami*, 598 F.3d 753, 762-63 (11th Cir. 2010). What this means is that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (quoting *Iqbal*, 556 U.S. at 676). The standard is not akin to a probability requirement but simply demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Where the claim at issue is a violation of the right to due process, a plaintiff must show: "(1) a deprivation of a constitutionally-protected . . . interest; (2) state

3

action; and (3) constitutionally inadequate process." *Woods v. Comm'r*, 951 F.3d 1288, 1293 (11th Cir. 2020) (quoting *Worthy v. City of Phenix City*, 930 F.3d 1206, 1223 (11th Cir. 2019)). Recent opinions have framed the relevant inquiry as focusing on first, "whether there exists a liberty or property interest which has been interfered with by the State," and second, "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Wainwright v. DeSantis*, Case No. 3:25-cv-607 (N.D. Fla. June 6, 2025) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

### III.   Mr. Lawrence has a due process right to access a transcript of his state executive clemency interview.

####   i.   Due process concerns regarding provision of the clemency transcript

Clemency power exists "to help ensure that justice is tempered by mercy." *Cavazos v. Smith*, 565 U.S. 1, 8-9 (2011). But "[f]ar from regarding clemency as a matter of mercy alone, we have called it 'the "fail safe" in our criminal justice system.'" *Harbison v. Bell*, 556 U.S. 180, 192 (2009) (quoting *Herrera v. Collins*, 506 U.S. 390, 415 (1993)). It is "deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Herrera*, 506 U.S. at 411-12.

Although there is no constitutional right to a clemency review itself, where the State has created a procedural entitlement, even if significant discretion is

involved in carrying it out, the process must comply "with the dictates of the Constitution-and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 389 (1985). A state creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). This occurs when a State: 1) establishes "substantive predicates" to guide official decision-making; and (2) mandates the outcome to be reached through "explicitly mandatory language." *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454 (1989).

Florida, through its Rules of Executive Clemency, has created a procedural entitlement to a clemency interview and written submission prior to the signing of an execution warrant. *See* Rule 15(B) (the clemency investigation "shall include…an interview with the inmate, who may have clemency counsel present, by the Commission"). "**The attorney for the state, the inmate's clemency counsel, the victim's family, the inmate, or any other interested person may file a written statement, brief, or memorandum on the case[.]**" Rule 15(G). After the interview, but prior to issuance of an executive clemency determination (which, under Florida's scheme, occurs prior to the signing of a death warrant):

> [T]he Commissioners who personally interviewed the inmate shall prepare and issue a final report on their findings and conclusions. The final report shall include: (1) any statements made by the defendant, and defendant's counsel, during the course of the investigation, (2) a detailed summary from each Commissioner who interviewed the

5

inmate; and (3) information gathered during the course of the investigation.

Rule 15(D). This report, prepared by the Clemency *Commission*, shall be forwarded to members of the Clemency *Board*, which has discretion to hold a clemency hearing. Rule 15(D)-(F), 15(H).

> Due to the nature of the information presented to the Clemency Board, all records and documents generated and gathered in the clemency process as set forth in the Rules of Executive Clemency are confidential and shall not be made available for inspection to any person except members of the Clemency Board and their staff. Only the Governor, and no other member of the Clemency Board, nor any other state entity that may be in the possession of Clemency Board materials, has the discretion to allow such records and documents to be inspected or copied.

Rule 16. However, "**[u]pon request, a copy of the actual transcript of any statements or testimony of the inmate relating to a clemency investigation shall be provided to the state attorney, the inmate's clemency counsel, or victim's family**." Rule 15(G).

Thus, while certain aspects of the clemency process are discretionary—such as whether to hold a hearing before the Clemency Board—the provision of a clemency interview by the Clemency Commission is *not discretionary*, nor is the death-sentenced individual's right to appear, to be represented by counsel in that proceeding, and to submit their own written submission following the interview. Further, even where significant executive discretion is involved in many aspects of the clemency process, "its operation must conform to the due process requirements

of the Fourteenth Amendment[,] *Smith v. Att'y Gen.*, No. 22-12950, 2023 WL 2592286 (11th Cir. Mar. 22, 2023)—namely, that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

Florida state courts have recognized that clemency is a critical "part of [Florida's] overall death penalty procedural scheme[,]" *Remeta v. State*, 559 So. 2d 1132, 1135 (Fla. 1990). It is frequently the last forum for a death-sentenced individual, *see, e.g.*, *Harbison*, 556 U.S. at 196 ("the sequential enumeration [of clemency at the end of the appeals process] suggests an awareness that clemency proceedings are not as divorced from judicial proceedings as the Government submits"), and it is the only stage that considers factors that the legal system does not correct—*i.e.*, remorse, rehabilitation, and environmental influences. *See Herrera*, 506 U.S. at 412.

Further, caselaw from the United States Supreme Court makes clear that death-sentenced individuals retain a protected interest in their lives at the clemency stage, and as such due process requires that at least "some minimal procedural safeguards apply to clemency proceedings." *See, e.g.*, *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring in part and concurring in the judgment); *see also Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1268, 1269 n.2 (11th Cir. 2014) (acknowledging that Justice O'Connor's concurrence set

binding precedent). Judicial intervention may be warranted in egregious circumstances, like where a record reflects such arbitrariness as "a state official flipp[ing] a coin to determine whether to grant clemency." *Woodard*, 523 U.S. at 288-89.

Under the Fifth and Fourteenth Amendments, "fundamental fairness is the hallmark of the procedural protections afforded by the Due Process Clause." *Ford v. Wainwright*, 477 U.S. 399, 424 (1986) (Powell, J., concurring in part and in the judgment). Such fairness entails "notice and opportunity for hearing appropriate to the nature of the case[,]" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)), which must occur "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). *See also Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("the central meaning of procedural due process" is that "parties whose rights are affected are entitled to be heard; and in order that they may enjoy the right they must first be notified.") (quoting *Baldwin v. Hale*, 68 U.S. 223, 233 (1863)).

One aspect of "the due process mandate of fundamental fairness" is that criminal appellants must receive access to a "transcript or an adequate substitute" via "a document which would 'place before the [decisionmaker] an equivalent report of the events…from which the appellant's contentions arise." *Bundy v. Wilson*, 815 F.2d 125, 132 (1st Cir. 1987) (quoting *Draper v. Washington*, 372 U.S. 487 (1963));

*see also id.* at 135 ("The fundamental fairness guaranteed by the due process clause requires that such defendants be granted a transcript, or an adequate written substitute . . . The threshold requirement is that a criminal appellant be provided with 'a record of sufficient completeness to permit proper consideration of his claims.'") (quoting *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971)); *Hardy v. United States*, 375 U.S. 277, 288 (1964) (stating that a transcript is the most basic tool of effective appellate advocacy).

Just as the fundamental fairness assurances of the Due Process Clause encompass the provision of transcripts to ensure that one has a "meaningful and fair opportunity" to present his case and that the decisionmaker will "have a full and accurate understanding of an appellant's contentions before dispensing with [an] appeal," *Bundy*, 815 F.2d at 133, so too does this requirement stand in the context of capital clemency review. Even "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution[.]" *Evitts*, 469 U.S. at 389 (1985); *see also Woodard*, 523 U.S. at 288-89 (1998) (O'Connor, J., concurring in part and concurring in the judgment) (confirming some due process guarantees still apply in clemency proceedings).

Defendants' overbroad application of Florida's statutory and rules-based clemency secrecy provisions to deny Mr. Lawrence access to his clemency interview

transcript is constitutionally intolerable. The United States Supreme Court has consistently upheld the requirement that transcripts be provided for nearly all other stages of the criminal process:

> The only cases that have rejected indigent defendants' claims to transcripts have done so either because an adequate alternative was available but not used, *Britt v. North Carolina*, 404 U.S. 226 (1971), or because the request was plainly frivolous and a prior opportunity to obtain a transcript was waived[.] *United States v. MacCollom*, 426 U.S. 317 (1976).

*Bounds v. Smith*, 430 U.S. 817, 822 n.8 (1977) (overruled in part by *Lewis v. Casey*, 518 U.S. 343, 354 (1996)); *see also, e.g.*, *Roberts v. LaVallee*, 389 U.S. 40 (1967) (State must provide preliminary hearing transcript); *Williams v. Oklahoma City*, 395 U.S. 458 (1969) (State must provide transcript of petty offense trial); *Mayer v. City of Chicago*, 404 U.S. 189 (1971) (State must provide transcript of nonfelony trial); *Long v. District Court of Iowa*, 385 U.S. 192 (1966) (State must provide transcript of post-conviction proceedings); *Gardner v. California*, 393 U.S. 367 (1969) (State must provide habeas corpus transcript).

Because "minimum requirements [of procedural due process are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate[.]" *Vitek v. Jones*, 445 U.S. 480, 491 (2005) (citing *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). Thus, while Defendants are alleging that the Rules of Executive Clemency do not explicitly provide for a death-sentenced inmate to independently receive a copy of their own

transcript, and thus it may be withheld from him under Florida law and procedure, this is not sufficient to protect his federal due process rights.

Critically, due process is not satisfied by the presence of Mr. Lawrence and his clemency counsel during the clemency interview. The United States Supreme Court has made clear that deprivation of a transcript—standing alone—establishes constitutional error. In *Gardner*, the Court explained that without a transcript, the defendant "would have only his own lay memory of what transpired before the [decisionmaker]" and that even a lawyer familiar with the proceedings at issue "would be lost without such a transcript, save perhaps for the unusual and exceptional case." 393 U.S. at 369.

Further, it is not curative that clemency counsel may receive a copy of the transcript, but not Mr. Lawrence. *See Byrd v. Wainwright*, 722 F.2d 716, 718-19 (11th Cir. 1984) ("We agree that denial of access to the transcript is 'incompatible with effective appellate advocacy,' … whether the advocate be counsel or defendant alone.") (quoting *Hardy v. United States*, 375 U.S. 277, 288 (1964)) (Goldberg, J., concurring) (internal citation omitted); *Gardner v. California*, 393 U.S. 367 (1969) (inmates may obtain transcripts even when they have no entitlement to counsel); *Lane v. Brown*, 372 U.S. 477 (1963) (public defender's approval may not be required to obtain *coram nobis* transcript); *see also Eskridge v. Washington Prison Bd.*, 357 U.S. 214 (1958) (provision of transcript may not be conditioned on approval of

11

overseeing decisionmaker); *Draper v. Washington*, 372 U.S. 487 (1967) (same). Rather, the fact that clemency counsel may be provided a transcript should he request it—but is forbidden from sharing it with his own client—renders Mr. Lawrence's deprivation all the more arbitrary.

The provision of Mr. Lawrence's clemency transcript, or a constitutionally adequate documentary substitute, is perhaps one of the most simple and basic procedural safeguards that could apply to a critical capital proceeding like clemency. In the context of the final capital proceeding standing between Mr. Lawrence and a death warrant, his due process entitlement to the clemency interview transcript is self-evident. *See Britt*, 404 U.S. at 228 ("[O]ur cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.") (emphasis added).

> ii. **Regardless of a general right, withholding Mr. Lawrence's transcript violates due process because, as Defendants are aware, his disabilities render him unable to otherwise meaningfully participate in the clemency process**

Beyond the due process implications from Defendants' withholding of a clemency transcript in capital cases generally, the right to due process is violated by withholding Mr. Lawrence's clemency transcript amidst the particular circumstances of his proceedings. Due to his severe cognitive impairments and memory deficits, he is uniquely disadvantaged from meaningful participation in the clemency process without access to the interview transcript. As such, the deprivation

12

places an "atypical and significant hardship" on him. *See Woodard*, 523 U.S. at 283 (Rehnquist, C.J., opinion).

Prior to Mr. Lawrence's clemency interview, Defendants were made aware that his disabilities and traumatic exposures would impede his ability to communicate during the structured clemency interview:

> Please find attached a set of recommendations from Dr. Adeyinka Akinsulure-Smith, Ph.D., ABPP, which will assist Mr. Lawrence in meaningfully participating in his clemency interview this Friday, February 27. As you may already be aware, Mr. Lawrence suffers from an intellectual disability and a profoundly traumatic background, both of which have bearing on his ability to verbally communicate. The accommodations suggested by Dr. Akinsulure-Smith are critical to enabling Mr. Lawrence to meaningfully respond to the Clemency Commission's inquiries.

ECF 3 at App. A (2/24/26 Email from Katherine A. Blair to Defendants Fortune and Whitworth).

They were advised, including by a preeminent psychologist, Dr. Adeyinka Akinsulure-Smith, that Mr. Lawrence was uniquely impaired in verbally communicating about issues of particular relevance to clemency determinations:

> Mr. Lawrence will most likely have difficulty articulating his experiences (as we have already noted) during any type of sustained questioning. In fact, it is highly likely that Mr. Lawrence's memories of those traumatic experiences may be too overwhelming to verbalize, especially if (as I suspect), they were accompanied by extreme humiliation….Finally, please recognize that all of these trauma responses that impede effective communication will be further exacerbated by his intellectual disability diagnosis.

ECF 3 at App. B (2/23/26 Letter from Dr. Adeyinka Akinsulure-Smith).

13

In particular, Defendants were aware that Mr. Lawrence's ability to meaningfully participate in the clemency interview process—including providing information on his victimization at the hands of the State during his confinement at the Arthur G. Dozier School for Boys—required additional time and the ability to process questions and responses in writing. *See* ECF 3 at App. B, C; *see also* ECF 3 at App. E (recounting that questions were asked about Mr. Lawrence's experience at Dozier).

The information that Defendants were aware Mr. Lawrence would struggle to communicate is directly relevant to a clemency determination in his case:

> [T]he extensive polyvictimization Mr. Lawrence endured throughout his early formative years – from infancy, childhood, and through his adolescence (abusive and neglectful home environment, time at Dozier, incarceration in adult settings) have all contributed to his current situation. These underlying factors likely led to his current death sentence. While these mitigating factors were not taken into account when his death sentence was imposed, it would be impossible to fully understand Mr. Lawrence's case without also considering the severe impact that his experiences of chronic exposure to toxic stress have had on his development.
>
> *                    *                    *
>
> I strongly recommend that the impact of the polyvictimization he has endured throughout his life, what he has suffered while in the care of the Dozier School for Boys and Florida adult-prison system, and his cognitive deficits be taken into account when analyzing Mr. Lawrence's overall mental health and when considering his growth trajectory since his incarceration on death row.

ECF 3 at App. H, 2, 16 (further discussing the lifelong deleterious impact of Mr. Lawrence's experience at Dozier, as well as its exacerbation of and by his

14

intellectual disability and lack of prior social supports). As has been made clear by successive postconviction litigation in Mr. Lawrence's case, there is an abundance of information directly related to concerns the Clemency Commission had regarding Mr. Lawrence's time at Dozier. *See generally*, *Lawrence v. Florida*, No. SC2025-2061, Florida Supreme Court, Initial Brief (Feb. 9, 2026) (discussing Mr. Lawrence's extensive State-perpetrated victimization at Dozier and his recognition by the Office of the Attorney General as an individual eligible for tangible and equitable reparations based on that victimization). And, Defendants were aware of the fact that Mr. Lawrence would be unable to provide this information without certain accommodations, including Dr. Akinsulure-Smith's recommendations:

1. Where possible, present Mr. Lawrence all materials and questions to be asked of him before his hearing so that he can review and process his responses ahead of time as he may become overwhelmed with a myriad of emotions that could impact his memory and verbal capacities (all further compromised by his intellectual disability).

2. Write all information using simple, clear language with short and complete sentences.

3. During his Clemency Hearing, ask all questions slowly, simply, and clearly (again, utilizing short and complete sentences).

4. If he appears "frozen," "shut down," or confused; please repeat, reword and/or rephrase questions.

5. Allow time for his responses.

6. Include the opportunity for him to submit additional written responses upon reflection after the Clemency Interview.

7. Permit rest/break periods as needed during the process.

Sincerely,

15

ECF 3 at App. B (providing communication recommendations for Mr. Lawrence's clemency interview based on his disabilities).

With full awareness of what could be lost, Defendants did not simply fail to adhere to Dr. Akinsulure-Smith's recommendations for meaningful participation—they withheld **the most basic tool of advocacy** from Mr. Lawrence by refusing to allow him to even see the transcript of his interview. This, combined with Mr. Lawrence's significant cognitive deficits and memory impairments—of which Defendants were aware—precluded him from any ability to (1) recall what had been asked of him by the individuals who would be determining whether he would live or die; and (2) provide answers via a written submission that his disabilities prevented him from expressing during the interview. In this context, Mr. Lawrence was so deprived of any meaningful notice and opportunity to be heard, the minimal due process guarantees at clemency were violated. *See Cleveland Bd. of Ed.*, 470 U.S. at 542; *Mathews v. Eldridge*, 424 U.S. at 333; *Woodard*, 523 U.S. at 289.

IV. **Defendants acted under color of state law when they deprived Mr. Lawrence of his transcript and thus violated his federal constitutional rights.**

By using their positions of State authority to impede Mr. Lawrence's access to his clemency transcript, Defendants acted under color of state law when they violated his federal rights. In order to be entitled to relief under § 1983, the deprivation of a Constitutional or federal right must have occurred under color of

16

state law. *Lindke*, 601 U.S. at 194-95 (2024). "Color of law means 'pretext of law,' and it does not necessarily mean under authority of law." *United States v. Picklo*, 190 F. App'x 887, 888 (11th Cir. 2006) (quoting *United States v. Jones*, 207 F.2d 785, 786-87 (5th Cir. 1953)). Actions that fall into "under color of state law" need not be specifically authorized by law. *See, e.g.*, *Brown v. Miller*, 631 F.2d 408, 411 (5th Cir. 1980) ("Action taken 'under color of' state law is not limited only to that action taken by state officials pursuant to state law."). Even when a defendant acts illegally, it can still be an action under color of state law. *Picklo*, 190 F. App'x at 888. "Determining whether a defendant acted under color of law involves an assessment of the totality of the circumstances." *Id*. (citing *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303-04 (11th Cir. 2001)).

In Florida, the clemency process is a part of the death penalty scheme. *See* Fla. Stat. § 922.052(b), (c). Each of the named defendants in this case participated in the denial of Mr. Lawrence's federal rights, actually or constructively, through their official positions. Mr. Lawrence has appropriately sued Defendants in this action in their official capacities. "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Penhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). The Eleventh Amendment bars suits against state officials where the suit is, in essence, a suit against the State and not the officials, and the officials are only sued nominally.

*Id*. However, the Supreme Court has recognized time and again that there is "an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Id*. at 102. Likewise, a suit that challenges whether a state official's action violates an individual's constitutional rights is not one against the State. *See, e.g.*, *Doe v. Round Valley Unified School Dist.*, 873 F. Supp. 2d 1124, 1130-31 (D. Ariz. 2012) ("Section 1983 provides no cause of action unless someone acting 'under color of law' violated a constitutional or federal statutory right.").

This is not a suit that names Defendants nominally while actually seeking to sue the State of Florida. This suit challenges the actions of the named officials in their application of Florida's clemency statutes, rules, and procedures against Mr. Lawrence in a manner that violated his constitutional rights. Defendants' actions in applying these provisions occurred with and through the authority vested in them through Florida's statutory and rules-based scheme, and those actions violated Mr. Lawrence's constitutional rights. Thus, Defendants in this case are sued in their official capacities, as officials or agents of FCOR or the Clemency Board, and are appropriately named as defendants in this matter.

## V.    42 U.S.C. § 1983 is the appropriate vehicle for this claim.

Where, as in clemency proceedings, "a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with

18

the dictates of the Constitution[.]" *Evitts*, 469 U.S. at 389. Where State actors fail to do so and violate constitutional rights, a § 1983 challenge is appropriate. *Penhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).

The Eleventh Circuit has made clear that jurisdiction to consider the merits of a challenge to a State's pre-execution procedure was appropriate under § 1983, where that challenge would not constitute an attack on the underlying validity of the conviction or sentence. Indeed, since the United States Supreme Court's decision in *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Eleventh Circuit has considered numerous § 1983 challenges to state clemency proceedings. *Mann v. Palmer*, 713 F.3d 1306, 1316-17 (11th Cir. 2013); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1332-33 (11th Cir. 2015); *Bowles v. DeSantis*, 934 F.3d 1230, 1239 (11th Cir. 2019). Under clear circuit precedent, a death-sentenced individual's claim of a due process violation at the clemency stage is properly brought under 42 U.S.C. § 1983. *See Barwick v. Governor of Florida*, 66 F.4th, 896, 901 (11th Cir. 2023) ("[We] have explained that a prisoner's 'complaint about Florida's clemency procedures may only be brought under 42 U.S.C. § 1983.'") (quoting *Valle v. Sec'y, Fla. Dep't of Corr.*, 654 F.3d 1266, 1268 (11th Cir. 2011)).

Mr. Lawrence's complaint does not seek to vacate his conviction or sentence, nor to bring about his release from confinement. He merely moves this Court to enforce his Fourteenth Amendment rights by requiring that Mr. Lawrence be

19

provided the transcript of his clemency interview, which is necessary to his meaningful participation at the last critical capital proceeding prior to the signing of a death warrant. In other words, he seeks only the "minimal" degree of due process protections necessary to protect his continued life and liberty interests. *Woodard*, 523 U.S. 272, 288 (1998). 42 U.S. § 1983 is the appropriate vehicle for Mr. Lawrence's due process challenge.

## VI.    Conclusion

For the reasons above and in his accompanying complaint, Mr. Lawrence requests that this Court intervene and issue declaratory and injunctive relief, find that Defendants violated his federal constitutional due process rights during executive clemency review by withholding his interview transcript; and order Defendants—prior to making an executive clemency determination—to provide Mr. Lawrence with a transcript of his clemency interview and afford him adequate time to prepare a written submission in support of a life sentence.

Respectfully submitted,

/s/ Katherine A. Blair
KATHERINE A. BLAIR
   Assistant Chief, Capital Habeas Unit
HEATHER GLOBERMAN
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301
(850) 942-8818
Katherine_Blair@fd.org

20

*Counsel for Mr. Lawrence*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading has been furnished by electronic mail to counsel for the Defendants, the Office of the Attorney General. Service will be completed upon issuance of the summons.

/s/ Katherine Blair
KATHERINE BLAIR